**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOHN DOE A, *et al.*,<br><br>Plaintiffs;<br><br>v.<br><br>CAROL SPAHN, in her official capacity<br>as Director of the Peace Corps,\*<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:23-cv-02859 (CJN)<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

---

\* The caption in Plaintiffs' First Amended Complaint refers to Ms. Spahn as "Administrator," but this is a misnomer; her title is Director of the Peace Corps.

# TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Background ............................................................................................................... 3

    A.   The Peace Corps Act ............................................................................... 3

    B.   The Medical Clearance Process ............................................................. 5

        1.   Peace Corps Regulations Set the Medical Eligibility Standards ............................. 5

        2.   Medical Eligibility Screening ............................................................. 6

        3.   Review by the Pre-Service Review Board ............................................. 8

        4.   Administrative Process for Discrimination Claims ............................... 8

    C.   Medical Non-Clearance of Plaintiffs ................................................... 10

    D.   Procedural History ............................................................................... 12

Legal Standards ...................................................................................................... 12

Argument ................................................................................................................ 13

I.    Jane Doe E's claims should be dismissed as moot. ........................................... 13

II.   Whether brought pursuant to the Rehabilitation Act or the APA, Plaintiffs' discrimination claims should be dismissed because they failed to exhaust their administrative remedies. ................................................................................... 15

III.  Plaintiffs fail to state a claim under the Rehabilitation Act. ............................... 18

    A.   Congress did not create a private, non-administrative cause of action under the Rehabilitation Act to sue a federal agency for non-employment, non-funding decisions. ............................................................................................ 18

    B.   The Peace Corps Act precludes direct application of Section 504. ................ 26

IV.  Plaintiffs' attempted APA direct challenge to the Peace Corps' screening guidelines fails to state a claim. ......................................................................... 30

    A.   The Guidelines are not agency action subject to APA review. ..................... 31

    B.   The Guidelines are not *final* agency action subject to APA review. ............ 34

    C.   The Guidelines did not require notice-and-comment rulemaking. ................. 37

    D.   Plaintiffs' broadly alleged "pattern, practice, and/or policy" APA challenge fails for the same reasons. ......................................................................... 40

V.   Plaintiffs' claim for unreasonable delay fails to state a claim because the timetable for responding to discrimination complaints is discretionary. ............................... 40

Conclusion .............................................................................................................. 42

# INDEX OF EXHIBITS

Ex. 1    Vanessa B. Kerry, et al., *Partnering to Build Human Resources for Health Capacity in Africa: A Descriptive Review of the Global Health Service Partnership's Innovative Model for Health Professional Education and Training From 2013-2018*, 11(7) Int'l J. of Health Pol'y and Mgmt 919 (2022)

Ex. 2    Denial Letters Sent to Plaintiffs Through Peace Corps' Secure Messaging Platform (Communications with Applicant Reports)

        Ex. 2-A:    Denial Letter Sent to John Doe A

        Ex. 2-B:    Denial Letter Sent to John Doe B

        Ex. 2-C:    Denial Letter Sent to John Doe C

        Ex. 2-D:    Denial Letter Sent to Jane Doe A

        Ex. 2-E:    Denial Letter Sent to Jane Doe B

        Ex. 2-F:    Denial Letter Sent to Jane Doe C

        Ex. 2-G:    Denial Letter Sent to Jane Doe D

        Ex. 2-H:    Denial Letter Sent to Jane Doe E

Ex. 3    Pre-Service Nurse Standard Operating Procedure (SOP)

Ex. 4    Example of Screening Guideline Used by Pre-Service Screening Nurses – Screening Guideline for Acute Stress Disorder and PTSD

Ex. 5    Selection of Guidelines Used by Office of Health Services, Behavioral Health Advisors, as listed in Amended Complaint Paragraph 31:

        Acute Stress Disorder and Posttraumatic Stress Disorder (PTSD)

        Attention-Deficit/Hyperactivity Disorder

        Adjustment Disorders

        Counseling, Career-Counseling, or Life Coaching

        Generalized Anxiety Disorder

        Major Depressive Disorder

        Non-Suicidal Self-Injury Behavior

        Panic Disorder

        Previous Psychiatric Hospitalization

Suicidal Ideation, Plan or Attempt

Ex. 6    Peace Corps Manual Section (MS) 262, Peace Corps Medical Services Program

## TABLE OF AUTHORITIES

### CASES

*Abou-Hussein v. Mabus*,
   953 F. Supp. 2d 251 (D.D.C. 2013) ...................................................................... 13

*Abreu v. Howard Univ.*,
   93 F.4th 498 (D.C. Cir. 2024) .......................................................................... 17

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) .............................................................................. 19,  23

*Am. Council of the Blind v. Paulson*,
   463 F. Supp. 2d 51 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008) ............................. 24

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) ......................................................................... 41

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
   995 F.2d 1106 (D.C. Cir. 1993) ..................................................................... 38, 39

*Arden Wood, Inc. v. USCIS*,
   480 F. Supp. 2d 141 (D.D.C. 2007) ...................................................................... 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................... 13

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................... 35

*Beshir v. Holder*,
   10 F. Supp. 3d 165 (D.D.C. 2014) ...................................................................... 42

*Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.*,
   730 F. Supp. 2d 240 (D.D.C. 2010) ..................................................................... 39

*Browning v. Clinton*,
   292 F.3d 235 (D.C. Cir. 2002) ...................................................................... 13, 17

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ..................................................................... 34

*Castro v. Sec'y of Homeland Sec.*,
   472 F.3d 1334 (11th Cir. 2006) ........................................................................ 28

*Clark v. Skinner,*
   937 F.2d 123 (4th Cir. 1991) ................................................................. 22, 23, 24, 25

*Cnty. of Los Angeles v. Davis,*
   440 U.S. 625 (1979) ...................................................................................... 14

*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001) ..................................................................... 32

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
   589 U.S. 327 (2020) ...................................................................................... 20

*Conyers v. Merit Sys. Prot. Bd.,*
   388 F.3d 1380 (Fed. Cir. 2004) ..................................................................... 28

*Cooke v. U.S. Bureau of Prisons,*
   926 F. Supp. 2d 720 (W.D.N.C. 2013) .............................................. 16, 17, 18

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
   144 S. Ct. 2440 (2024) ............................................................................ 16, 17

*Cousins v. Sec'y of the U.S. Dep't of Transp.,*
   880 F.2d 603 (1st Cir. 1989) .............................................................. 22, 23, 24

*CropLife Am. v. EPA,*
   329 F.3d 876 (D.C.Cir.2003) ........................................................................ 35

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
   452 F.3d 798 (D.C. Cir. 2006) ....................................................... 35, 36, 37, 38

*Darby v. Cisneros,*
   509 U.S. 137 (1993) ...................................................................................... 15

*Doe v. Dist. of Columbia,*
   796 F. Supp. 559 (D.D.C. 1992) .................................................................... 24

*Doe 1 v. Apple Inc.,*
   96 F.4th 403 (D.C. Cir. 2024) ....................................................................... 14

*EEOC v. St. Francis Xavier Parochial Sch.,*
   117 F.3d 621 (D.C. Cir. 1997) ................................................................... 7, 13

*Egbert v. Boule,*
   596 U.S. 482 (2022) ...................................................................................... 20

*Elec. Priv. Info. Ctr. v. Internal Revenue Serv.,*
   910 F.3d 1232 (D.C. Cir. 2018) ..................................................................... 41

*Elk Run Coal Co. v. U.S. Dep't of Lab.*,
   804 F. Supp. 2d 8 (D.D.C. 2011) ................................................................... 40

*Field v. Napolitano*,
   663 F.3d 505 (1st Cir. 2011) ........................................................................ 28

*Food & Water Watch v. EPA*,
   5 F. Supp. 3d 62 (D.D.C. 2013) ................................................................... 37

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
   353 U.S. 222 (1957) ..................................................................................... 29

*Gagliardi v. TJCV Land Tr.*,
   889 F.3d 728 (11th Cir. 2018) ..................................................................... 14

*Galaza v. Mayorkas*,
   61 F.4th 669 (9th Cir. 2023) ........................................................................ 28

*Garcia v. Stewart*,
   531 F. Supp. 3d 194 (D.D.C. 2021) ............................................................. 33

*Green v. Bock Laundry Mach. Co.*,
   490 U.S. 504 (1989) ..................................................................................... 29

*Guidry v. Sheet Metal Workers Nat'l Pension Fund*,
   493 U.S. 365 (1990) ..................................................................................... 29

*Honig v. Doe*,
   484 U.S. 305 (1988) ..................................................................................... 14

*In re Core Comm'cn, Inc.*,
   531 F.3d 849 (D.C. Cir. 2008) ..................................................................... 41

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) ..................................................................... 41

*Inst. for Wildlife Prot. v. Norton*,
   337 F. Supp. 2d 1223 (W.D. Wash. 2004) ................................................... 40

*J.L. v. Soc. Sec. Admin.*,
   971 F.2d 260 (9th Cir. 1992), *disapproved of by Lane v. Pena*, 518 U.S. 187 (1996) .............. 22

*Jesner v. Arab Bank, PLC*,
   584 U.S. 241 (2018) ................................................................................. 19, 20

*Joren v. Napolitano*,
   633 F.3d 1144 (7th Cir. 2011) ..................................................................... 28

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ............................................................................... 13

*Kareem v. Haspel*,
  986 F.3d 859 (D.C. Cir. 2021) .......................................................................... 13, 14

*Kaswatuka v. U.S. Dep't of Homeland Sec.*,
  7 F.4th 327 (5th Cir. 2021) ................................................................................... 28

*Lane v. Pena*,
  518 U.S. 187 (1996) ......................................................................... 19, 21, 22, 24

*Lane v. Pena*,
  867 F. Supp. 1050 (D.D.C. 1994), *vacated in part*, 518 U.S. 187 (1996) ............... 24

*Lane v. Pena*,
  No. 95–365, 1996 WL 115795 (S. Ct. Mar. 15, 1996) .......................................... 22

*Lemon v. Geren*,
  514 F.3d 1312 (D.C. Cir. 2008) ............................................................................ 14

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .............................................................................................. 38

*Long Term Care Pharmacy All. v. Leavitt*,
  530 F. Supp. 2d 173 (D.D.C. 2008) ...................................................................... 42

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................. 32, 33, 34

*Malladi Drugs & Pharms., Ltd. v. Tandy*,
  552 F.3d 885 (D.C. Cir. 2009) .............................................................................. 16

*Marks v. Comm'r of Internal Revenue*,
  947 F.2d 983 (D.C. Cir. 1991) .............................................................................. 36

*Mayor & Alderman of City of Vicksburg v. Vicksburg Waterworks Co.*,
  202 U.S. 453 (1906) .............................................................................................. 26

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) .............................................................................................. 16

*Mexichem Specialty Resins, Inc. v. E.P.A.*,
  787 F.3d 544 (D.C. Cir. 2015) .............................................................................. 41

*Mississippi v. Louisiana*,
  506 U.S. 73 (1992) ................................................................................................ 26

*Mittleman v. Postal Regul. Comm'n,*
   757 F.3d 300 (D.C. Cir. 2014) ........................................................ 27

*Molycorp, Inc. v. EPA,*
   197 F.3d 543 (D.C.Cir.1999) .......................................................... 35

*Moya v. U.S. Dep't of Homeland Sec.,*
   975 F.3d 120 (2d Cir. 2020) ..................................................... 22, 25

*Myers v. Bethlehem Shipbuilding Corp.,*
   303 U.S. 41 (1938) ......................................................................... 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
   551 U.S. 644 (2007) ....................................................................... 27

*Nat'l Ass'n of Home Builders v. Norton,*
   415 F.3d 8 (D.C. Cir. 2005) ............................................................ 37

*Nat'l Ass'n of the Deaf v. Trump,*
   486 F. Supp. 3d 45 (D.D.C. 2020) ..................................... 19, 23, 24

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.,*
   456 F. Supp. 3d 16 (D.D.C. 2020) ................................................. 34

*Nat'l Treasury Emps. Union v. King,*
   961 F.2d 240 (D.C. Cir. 1992) ........................................................ 16

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .............................................................. 31, 34, 40

*Norwest Bank Minn. Nat. Ass'n v. FDIC.,*
   312 F.3d 447 (D.C. Cir. 2002) ........................................................ 29

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
   465 F.3d 977 (9th Cir. 2006) .......................................................... 17

*Or. Nat. Res. Council v. Devlin,*
   776 F. Supp. 1440 (D. Or. 1991) .................................................... 36

*Parisi v. Davidson,*
   405 U.S. 34 (1972) ......................................................................... 18

*Patsy v. Bd. of Regents of Fla.,*
   457 U.S. 496 (1982) ....................................................................... 16

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,*
   588 U.S. 1 (2019) ........................................................................... 38

*Pereira v. U.S. Dep't of Just.*,
  No. 16-cv-2599, 2016 WL 2745850 (S.D.N.Y. May 11, 2016) .............................................. 16

*Powell v. McCormack*,
  395 U.S. 486 (1969) ..................................................................................................... 14

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................................. 33

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ..................................................................................................... 27

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976) ..................................................................................................... 27

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  310 F. Supp. 3d 7 (D.D.C. 2018) .................................................................................... 33

*RCM Technologies, Inc. v. U.S. Department of Homeland Security*,
  614 F. Supp. 2d 39 (D.D.C. 2009) ................................................................ 32, 34, 37

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  173 F. Supp. 2d 41 (D.D.C. 2001), *aff'd*, 324 F.3d 726 (D.C. Cir. 2003) .............................. 17

*Sai v. Dep't of Homeland Sec.*,
  149 F. Supp. 3d 99 (D.D.C. 2015) ........................................................ 19, 22, 23

*Scahill v. Dist. of Columbia*,
  909 F.3d 1177 (D.C. Cir. 2018) ...................................................................................... 13

*Sec. Indus. & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*,
  67 F. Supp. 3d 373 (D.D.C. 2014) .................................................................................. 37

*Sierra Club v. EPA*,
  21 F.4th 815 (D.C. Cir. 2021) ........................................................................................ 27

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) .................................................................... 32, 33

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) ...................................................................................... 13

*Splane v. West*,
  216 F.3d 1058 (Fed. Cir. 2000) ..................................................................................... 38

*Tesoro Refin. & Mktg. Co. v. Fed. Energy Regul. Comm'n*,
  552 F.3d 868 (D.C. Cir. 2009) ....................................................................................... 17

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979) ............................................................................ 20

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979) ............................................................................. 21

*Trump v. New York*,
    592 U.S. 125 (2020) ..................................................................... 14, 15

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ........................................................................... 28

*United States v. Sum of $70,990,605*,
    234 F. Supp. 3d 212 (D.D.C. 2017) .................................................... 14

*Viet. Veterans of Am. v. Shinseki*,
    599 F.3d 654 (D.C. Cir. 2010) ........................................................... 40

*W. Org. of Res. Councils v. Zinke*,
    892 F.3d 1234 (D.C. Cir. 2018) ......................................................... 42

*Wisher v. Coverdell*,
    782 F. Supp. 703 (D. Mass. 1992) ................................................ 21, 25

*Wright v. Foreign Serv. Grievance Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007) .................................................... 12

*Xie v. Kerry*,
    780 F.3d 405 (D.C. Cir. 2015) ........................................................... 33

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..................................................................... 19, 20

## STATUTES

5 U.S.C. § 551 ...................................................................................... 31

5 U.S.C. § 553 ...................................................................................... 38

5 U.S.C. § 702 ......................................................................... 21, 23, 31

5 U.S.C. § 704 ............................................................................... 15, 34

5 U.S.C. § 706 ...................................................................................... 40

8 U.S.C. § 1153 .................................................................................... 33

22 U.S.C. § 2501 .................................................................................... 4

22 U.S.C. § 2501-1 ..................................................................................................... 4

22 U.S.C. § 2504 ............................................................................................... *passim*

22 U.S.C. § 2504a .................................................................................................... 5

22 U.S.C. § 2519 ...................................................................................................... 4

22 U.S.C. § 2521a .................................................................................................... 5

22 U.S.C. § 2522 ...................................................................................................... 5

29 U.S.C. § 791 ................................................................................................. 18, 19

29 U.S.C. § 794 ................................................................................................ *passim*

29 U.S.C. § 794a ....................................................................................... 16, 19, 21, 25

42 U.S.C. § 2000e-16 ............................................................................................ 16

Peace Corps Act,
Pub. L. No. 87-293, 75 Stat. 612 (1961)
(codified as amended at 22 U.S.C. §§ 2501–2523) ................................................. 4

Rehabilitation Act of 1973,
Pub. L. No. 93-112, 87 Stat. 355 ........................................................................... 18

Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments
of 1978,
Pub. L. No. 95-602, 92 Stat. 2955 ....................................................... 19, 20, 21, 28

Domestic Volunteer Service Act Amendments of 1979,
Pub. L. No. 96-143, 93 Stat. 1074 ......................................................................... 29

International Security and Development Cooperation Act of 1981,
Pub. L. No. 97-113, 95 Stat. 1519 ........................................................................... 4

Domestic Volunteer Service Act Amendments of 1984,
Pub. L. No. 98-288, 98 Stat. 189 ........................................................................... 29

ATSA,
Pub. L. No. 107-71, 115 Stat. 597 (2001), codified as note to 49 U.S.C. § 44935 .................. 28

**RULES**

Fed. R. Civ. P. 12 ............................................................................................. 1, 12

**REGULATIONS**

22 C.F.R. § 305.1 ........................................................................................................... 5

22 C.F.R. §§ 305.2–305.6 ............................................................................................. 5

22 C.F.R. § 305.4 .................................................................................................. *passim*

22 C.F.R. § 306.1 ........................................................................................................... 5

22 C.F.R. §§ 306.1–306.10 ............................................................................... 9, 15, 16

22 C.F.R. § 306.2 ...................................................................................................... 5, 8

22 C.F.R. § 306.3 ........................................................................................................... 5

22 C.F.R. § 306.8 ...................................................................................................... 9, 16

22 C.F.R. § 306.9 .................................................................................................. *passim*

22 C.F.R. § 306.10 ...................................................................................................... 10

Exec. Order No. 10,924,
    26 Fed. Reg. 1787 (Mar. 2, 1961) ......................................................................... 4

Exec. Order No. 11,603,
    36 Fed. Reg. 12,675 (July 3, 1971) ........................................................................ 4

Exec. Order No. 12,137 of May 16, 1979,
    44 Fed. Reg. 29,023 (May 18, 1979) ..................................................................... 5

## INTRODUCTION

Plaintiffs are eight individuals, each of whom applied and was provisionally invited to serve as a Peace Corps volunteer but then deemed by the Peace Corps to be medically ineligible for service. Their amended complaint challenges these individual medical clearance decisions under the Administrative Procedure Act (APA) and Section 504 of the Rehabilitation Act of 1973, as amended, while also attempting to bring more amorphous "policy or practice" claims seeking relief beyond the Plaintiffs themselves. Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Carol Spahn, in her official capacity as Director of the Peace Corps, hereby moves to dismiss Plaintiffs' First Amended Complaint.

The Peace Corps is a federal agency that aims to foster world peace and friendship by promoting mutual understanding between Americans and people abroad. Consistent with that mission, the Peace Corps selects and places Americans in more than 60 countries, including some of the most remote, isolated, and impoverished places in the world. Peace Corps regulations require that an applicant possess the capability to live and work in these isolated locations overseas in conditions of hardship. Additionally, because of the Peace Corps' statutory responsibility to provide necessary or appropriate health care to Peace Corps volunteers during service, the agency's regulations specify that for an applicant to be deemed eligible, the Peace Corps must be capable of providing such health care to the applicant in the country of invitation. The medical clearance process thus serves an important purpose in ensuring the health and safety of volunteers during placements abroad, which often last as long as 27 months.

Each Plaintiff challenges the Peace Corps' determination that he or she was medically not qualified to serve as a Peace Corps volunteer abroad. The Peace Corps makes medical clearance decisions based on an applicant's current medical health condition, health history, other medical information provided by the applicant, and consideration of the medical resources available in the locations where Peace Corps applicants are invited to serve. The non-clearance determinations sent to each Plaintiff indicate that, because of Plaintiffs' individualized medical circumstances, including varying mental health conditions that were likely to be exacerbated under an austere

environment and sometimes stressful circumstances of Peace Corps volunteer service, Plaintiffs required a level of care during service that the Peace Corps could not ensure would be continuous or adequate, or would not cause undue disruption of service, particularly given the limited health care resources available in the locations where Plaintiffs sought to volunteer.

As a threshold matter, Defendant moves to dismiss the claims of Jane Doe E pursuant to Rule 12(b)(1).  Jane Doe E applied for a "Response Volunteer" position with the Peace Corps' Global Health Services Partnership almost eight years ago, in 2016.  Peace Corps Response Volunteers serve in shorter-term assignments compared to the program for regular Peace Corps volunteers—6 to 12 months, rather than the typical 27 months—and they apply to specific programs.  The Peace Corps' Global Health Services Partnership to which Jane Doe E applied no longer exists, and so Jane Doe E's claims for prospective relief are moot.  To the extent Jane Doe E may be interested in some other volunteer position with the Peace Corps, her claims are not ripe, as she does not allege that she has applied to and been rejected from a currently available position.

Defendant further moves to dismiss all the remaining claims pursuant to Rule 12(b)(6).  To start, the other seven plaintiffs—John Doe A, John Doe B, John Doe C, Jane Doe A, Jane Doe B, Jane Doe C, and Jane Doe D—cannot pursue their claims of discrimination here because they failed to exhaust their administrative remedies. Each plaintiff submitted an administrative complaint of discrimination to the Peace Corps' Office of Civil Rights and Diversity, as required by Peace Corps regulations, but (other than Jane Doe E, whose claims are moot) none of them waited for that administrative process to be completed before filing this suit.  Only after each Plaintiff properly exhausts his or her individual claims may those claims be adjudicated in due course based on a compiled administrative record for each case.

But Plaintiffs do not rest on their individual claims.  Instead, Plaintiffs seek broader, programmatic relief, challenging the sufficiency of Peace Corps' medical clearance practices as a whole.  Whether brought under the Rehabilitation Act or the APA, these efforts at remaking the agency's procedures across-the-board fail as a matter of law.

Plaintiffs' Rehabilitation Act claims fail for two reasons.  First, Plaintiffs fail to state a

claim under Section 504 of the Rehabilitation Act because there is no private cause of action under the Rehabilitation Act against the Peace Corps in these circumstances. The Rehabilitation Act does not contain an express cause of action to sue a federal agency for a Section 504 violation for non-funding activities, but it does provide an express cause of action to sue a federal agency in its capacity as provider of federal financial assistance. This treatment suggests that Congress intended plaintiffs to use the Administrative Procedure Act (which is available to Plaintiffs here) to vindicate substantive Section 504 rights with respect to an agency's non-funding programs and activities. Second, the Peace Corps Act precludes direct application of Section 504 to the volunteer enrollment decisions because it makes clear that the "terms and conditions" of volunteer enrollment are "exclusively those" set forth in the Peace Corps Act itself or otherwise established by the President through the Peace Corps Director. Again, the proper course is for Plaintiffs to challenge actions by Peace Corps—which has long prohibited disability discrimination by regulation—under the APA.

Plaintiffs' broad APA challenge to the Peace Corps' "clearance criteria and screening guidelines" should be also dismissed because those internal guidance documents do not constitute agency action, much less final agency action. Nor have Plaintiffs identified a substantive rule that required notice-and-comment rulemaking. For the same reasons, any broad "pattern or practice" claim also fails under the APA.

Finally, Plaintiffs' unreasonable delay claim should be dismissed because the time period for Peace Corps' discrimination investigations is left to agency discretion.

For these reasons, and as discussed further below, the Court should dismiss Plaintiffs' First Amended Complaint.

## BACKGROUND

### A. The Peace Corps Act

President Kennedy established the Peace Corps in March 1961 through Executive Order

10,924.[1]  Six months later, Congress passed the Peace Corps Act, legislatively establishing the Peace Corps.  Pub. L. No. 87-293, 75 Stat. 612, 612–25 (Sept. 22, 1961) (codified as amended at 22 U.S.C. §§ 2501–2523).  The Peace Corps' purpose is to "promote world peace and friendship" by making available to interested countries Americans "qualified for service abroad and willing to serve, under conditions of hardship, if necessary, to help the peoples of such countries . . . in meeting their needs for trained manpower, particularly in meeting the basic needs of those living in the poorest areas of such countries."  22 U.S.C. § 2501.  The Peace Corps was originally organized as an agency within the Department of State.  *See* Exec. Order No. 10924 § 1.  From 1971 to 1981, the Peace Corps was organized under a separate umbrella agency called ACTION, which also housed federal domestic volunteer programs including the AmeriCorps Volunteers in Service to America ("VISTA") program.  *See* Exec. Order No. 11,603 § 101, 36 Fed. Reg. 12675, 12675 (July 3, 1971).  It became an independent federal agency in December 1981.  *See* 22 U.S.C. § 2501-1; International Security and Development Cooperation Act of 1981, Pub. L. No. 97-113, § 601, 95 Stat. 1519, 1540–42 (Dec. 29, 1981).

Under the Peace Corps Act, the President is authorized to "enroll in the Peace Corps for service abroad qualified citizens and nationals of the United States," referred to as "volunteers." 22 U.S.C. § 2504(a).  Generally, Peace Corps volunteers are not federal employees.  *Id.* ("[E]xcept as provided in this chapter, volunteers shall not be deemed officers or employees or otherwise in the service or employment of, or holding office under, the United States for any purpose.").[2]  Peace Corps volunteers serve "at the pleasure of the President."  *Id.* § 2504(j).  The Act specifies that *all* "terms and conditions" of volunteer service "shall be exclusively those set forth in [the statute] and those consistent therewith which the President may prescribe."  *Id.* § 2504(a).  Such terms and conditions include those affecting volunteer "enrollment, training . . . , compensation, hours of

---

[1] President Kennedy signed the Executive Order on March 1, 1961, and it was printed in the Federal Register the next day. *See* Exec. Order No. 10924, 26 Fed. Reg. 1787, 1789 (Mar. 2, 1961).

[2] Volunteers are "deemed employees" of the U.S. Government only for limited purposes, including for tort claims, check cashing and currency exchange, passport fees, and other specified purposes not relevant here.  *See* 22 U.S.C. § 2504(i); *id.* § 2519.

work, benefits, leave, termination, and all other terms and conditions of . . . service." *Id.*  The Act prohibits the Peace Corps from discriminating against individuals "on account of race, sex, creed, or color"—but not disability—when enrolling volunteers and during their service.[3]  *Id.*  The Peace Corps has adopted disability discrimination prohibitions by regulation.  22 C.F.R. § 305.1(d); *see also id.* §§ 306.1, 306.2(a), 306.3.[4]

The Peace Corps provides health care—including any appropriate examinations, preventative, curative, or restorative health and medical care—directly to Peace Corps volunteers during their overseas service, primarily through medical officers employed by the Peace Corps at each overseas post. 22 U.S.C. § 2504(e); *id.* § 2504a; *id.* § 2522(3), (4).  The Act authorizes the President to determine what health care is "necessary or appropriate" and thus provided to volunteers in preparation for and during their service.  22 U.S.C. § 2504(e).

The President has delegated his authority and functions conferred by the Peace Corps Act to the Director of the Peace Corps.  Exec. Order No. 12137 of May 16, 1979, § 1-103, 44 Fed. Reg. 29023 (May 18, 1979).

## B.  The Medical Clearance Process

### 1.  Peace Corps Regulations Set the Medical Eligibility Standards

Peace Corps volunteers serve around the world in a wide variety of environments where medical resources and the ability to access medical services can vary significantly from those in the United States.  Peace Corps regulations set forth the standards for volunteer eligibility and selection, including medical eligibility.  22 C.F.R. §§ 305.2–305.6.  As noted above, the Peace Corps is responsible for ensuring that Peace Corps volunteers receive necessary or appropriate health care during their service.  "To ensure that the Peace Corps will be capable of doing so, Applicants must be medically qualified for Peace Corps."  *Id.* § 305.4(a).  To be deemed qualified, applicants "with or without reasonable accommodation, removal of architectural, communication

---

[3] Additionally, the Peace Corps may not use any "political test or political qualification" when selecting a person for enrollment as a volunteer.  22 U.S.C. § 2521a.

[4] As discussed further in Section II.B., *infra*, the disability discrimination authorities and remedies of the Rehabilitation Act applied to the Peace Corps from 1979 to 1984.

or transportation barriers, or the provision of auxiliary aids or services, must have the physical and mental capacity required to meet the essential eligibility requirements for a Volunteer." *Id.* § 305.4(a)(1). The Peace Corps' regulations outline the "essential eligibility requirements" as including the capability to:

> (i) Live and work independently in an isolated location overseas at the same socio-economic level and in similar conditions as members of the community to which the Applicant is assigned;
>
> (ii) Perform the job to which the Applicant is assigned; and
>
> (iii) Complete a specified tour of service without undue disruption.

*Id.* Additionally, the Peace Corps "must be capable of providing the Applicant with such health care as the Peace Corps deems to be necessary or appropriate." *Id.* § 305.4(a)(2). And the applicant must not pose a "direct threat" as defined in the regulation.[5] *Id.* § 305.4(a)(3). Peace Corps conducts an "individualized assessment" to determine whether each applicant meets these requirements and is "medically qualified" to serve. *Id.* § 305.4(b); *see also id.* § 305.4(c)(2).

### 2. Medical Eligibility Screening

Invitations to serve as a Peace Corps volunteer are made contingent on medical clearance. *See* 22 C.F.R. § 305.4. After the Peace Corps issues a contingent invitation to an applicant, the Peace Corps' Office of Health Services processes the applicant's medical review. During this review, "[t]he medical history of each applicant is individually assessed to determine the ability of the Peace Corps to safely meet the medical needs of that applicant in their country of invitation." Peace Corps, Medical and Health Frequently Asked Questions, https://www.peacecorps.gov/faqs/medical-health/ (last visited July 11, 2024). Staff within the Office of Health Services review an applicant's current medical condition, health history, and other medical information the applicant provides. *Id.*; *see, e.g.*, Ex. 2-A at 1 (communications with applicant report for John Doe

---

[5] "A 'direct threat' is a significant risk to the health or safety of others that cannot be eliminated by a reasonable accommodation to policies, practices or procedures, removal of architectural, communication or transportation barriers, or the provision of auxiliary aids or services." 22 C.F.R. § 305.4(c)(1).

A).[6]   The medical review requires "a dental and physical examination, lab work, selected immunizations, and, when indicated, a mental health assessment."  *Id.*  The Peace Corps "also request[s] personal statements related to individual conditions," to better understand applicant health needs.  *Id.*   "Depending on a person's age, sex, medical and mental health conditions, the review may also include additional tasks such as a mental health evaluation, an ECG, screening for osteoporosis, cervical, breast, and/or colon cancer, as well as specialty evaluations."  *Id.*

In some instances, an affirmative medical clearance decision can be made by a Pre-Service Nurse within the Office of Health Service's Pre-Service Unit.  The nurses use screening guidelines as a framework for analyzing an individual's submitted medical information in the context of their assignment and country of service.  Ex. 3 (Pre-Service Nurse SOP).  Among other things, the screening guidelines indicate what (basic) conditions can be cleared by a nurse without further review, and what conditions require review by a medical, dental, or behavioral health advisor to make a clearance determination.  *See id.*  Behavioral health conditions generally cannot be cleared by a Pre-Service Nurse but require review and clearance by an advisor within the Office of Health Service's Behavioral Health and Outreach Unit.  *See, e.g.*, Ex. 4 at 2 (screening guideline for Acute Stress Disorder and PTSD, indicating that an "individualized behavioral health advisor review is required").

In completing their medical clearance determinations, the Behavioral Health advisors utilize the applicable version of the Peace Corps' screening guidelines that list, by condition, various considerations for when an applicant may be medically qualified under the regulation.  *See* Ex. 5 (set of guidelines used by Behavioral Health advisors).  The guidelines note: "THESE ARE <u>GUIDELINES</u>. EACH APPLICANT RECEIVES AN INDIVIDUAL REVIEW AND CLEARANCE STATUS IS ULTIMATELY UP TO THE CLINICAL JUDGMENT OF THE REVIEWER."  *Id.* at 1 (emphasis in original).  These guidelines used by the Behavioral Health

---

[6] The denial letters issued by the Peace Corps to the Plaintiffs are incorporated by reference into the complaint and thus properly considered by the Court at the motion-to-dismiss stage. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  The same is true for Peace Corps guideline documents: Exhibits 3, 4, and 5.

advisors are substantively similar to the differently formatted screening guidelines used by the Pre-Service Nurse,[7] and are referred to collectively in this brief as "the Guidelines."  The Guidelines provide a structure for the individualized decisions made by the Office of Health Services staff.

### 3.  Review by the Pre-Service Review Board

An applicant who is determined by Office of Health Services staff not to be medically qualified for Peace Corps volunteer service may request a review of that decision.  22 C.F.R. § 305.4(e)(1).  The applicant has an opportunity to submit supplemental material during this process to show that they are medically qualified to serve.  *Id.*  The information submitted by the applicant will be reviewed by a physician and by the Pre-Service Review Board ("PSRB") composed of medical personnel.  *Id.*  The PSRB includes as voting members at least one physician as well as other medical professionals.  *Id.* § 305.4(e)(2).  "In any case involving review of issues involving mental health, at least one mental health professional from the [Behavioral Health] and Outreach Unit will also participate as a voting member."  *Id.*

### 4.  Administrative Process for Discrimination Claims

The Peace Corps regulations restrict discrimination more broadly than the agency's organic statute, prohibiting "discrimination based on race, color, religion, sex, national origin, age (40 or over), disability, and other bases provided for in applicable statutes, regulations or the Peace Corps Manual, or history of participation in the Peace Corps discrimination complaint process."  *Id.* § 306.2(a).[8]  An applicant or volunteer who believes that they have been subject to discrimination

---

[7] The screening guidelines used by the screening nurses are substantively similar but simplified versions of the guidelines used by the Behavioral Health advisors.  For example, the pre-service nurse SOP says that "[i]f any Assessment Criteria is not met, 'Nurse Clear' does not apply, forward to Medical Advisor for review and clearance determination."  Ex. 3 at 2 (Pre-Service Nurse SOP).  In other words, if an applicant meets all the criteria, they may be cleared by the nurse without further review, but if an applicant does not meet one of the criteria, they would be referred to the medical, dental, or behavioral health advisor for an individualized assessment.  These screening guidelines also contain information on what documentation should be collected from the applicants.  *See, e.g.*, Ex. 4 at 1 (listing "Documentation Required for Review").

[8] Because Peace Corps volunteers are not considered federal employees or otherwise in the service or employment of the United States for any purpose not specified in the Peace Corps Act, the regulations implementing Section 717 of the Civil Rights Act of 1964 (and other nondiscrimination policies and authorities), and the right to appeal to the Equal Employment Opportunity

on these bases—whether in connection with the medical clearance process or otherwise—"must bring such allegations to the attention of" Peace Corps' Office of Civil Rights and Diversity ("OCRD") within 60 days of the alleged discriminatory action.  22 C.F.R. § 306.8.  At that point a Counselor will be assigned to attempt to resolve the allegations through a "pre-complaint procedure."[9]  *Id.* § 306.8(a), (b).  The pre-complaint process should be completed within 30 days, but the OCRD Director may extend the period upon request of the aggrieved party or the agency for good cause shown.  *Id.* § 306.8(g).  If, after inquiry and counseling, an informal resolution of the allegation(s) is not reached, the Counselor will notify the aggrieved party in writing of the right to file a formal complaint of discrimination with the OCRD Director.  *Id.* § 306.8(h).

An applicant who wishes to file a formal complaint must do so within 30 days of receiving the Counselor's notice.  *Id.* § 306.9(a).  Upon acceptance of the complaint and receipt of the Counselor's report, the OCRD Director assigns an investigator and provides for an impartial investigation of the complaint.  *Id.* § 306.9(e).  The investigation "will include a review of the circumstances under which the alleged discrimination occurred, and any other circumstances which may constitute, or appear to constitute, discrimination against the complainant."  *Id.*  The investigator compiles the documents obtained during the investigation into a report of investigation ("ROI") and forwards it to the OCRD Director.  *Id.* § 306.9(i).  The OCRD Director prepares a draft, written proposed final agency decision ("FAD").  "To the extent feasible, this will be completed within 120 days of the filing of the [administrative] complaint.  However, the OCRD Director has discretion to extend the period."  *Id.*  The OCRD Director issues the draft, proposed FAD to the complainant with a copy of the ROI.  *Id.* § 306.9(j).  Upon receipt of the proposed FAD, the complainant has ten calendar days to submit an appeal of the proposed decision to the Peace Corps Director.  *Id.* § 306.9(k).  "The Peace Corps Director, or designee, will, to the extent

---

Commission, do not apply to volunteers, and instead the Peace Corps has its own regulations providing a required administrative process for volunteer allegations of discrimination, 22 C.F.R. §§ 306.1–306.10.

[9] As an alternative to assignment of a Counselor, the applicant may ask for alternative dispute resolution. 22 C.F.R. § 306.8(i).

feasible, decide the issue within 45 days of the date of receipt of the appeal." *Id.* § 306.9(l).  The Peace Corps Director's decision serves as the final agency decision for the discrimination complaint—unless the complainant does not timely appeal the proposed FAD, in which case the Peace Corps issues the proposed FAD as the final agency decision. *Id.* § 306.9(l), (m).

Where a FAD states that an applicant has been subjected to prohibited discrimination, the Peace Corps takes corrective action, which may include selecting the applicant as a trainee for service or provide such "other relief as may be deemed appropriate by the Peace Corps." *Id.* § 306.10.

### C.  Medical Non-Clearance of Plaintiffs

Each of the eight Plaintiffs was deemed medically not qualified to serve as a Peace Corps volunteer.  Am. Compl. ¶¶ 61, 84, 106, 131, 154, 176, 199, 221, ECF No. 18-1.  The initial denial letters sent to each Plaintiff reflect that the medical-non-clearance determinations were based on individual, applicant-specific reasons in each case:[10]

- The Peace Corps determined that it was not able to medically clear John Doe A at the time of his application due to an individualized assessment of his "current" and "recurrent" diagnosis of Major Depressive Disorder; the denial letter noted that his mental health provider indicated that John Doe A "experienced on and off moderate symptoms of feeling pressured, loneliness, sadness with the change of season and reduced daylight," and that he had "suicidal and self-harm thoughts" between the years 2014 and 2019.  Ex. 2-A.  Peace Corps determined that the Philippines—where John Doe A sought to serve—did not have "adequate or appropriate mental health care and psychiatric resources to effectively support [his] current condition." *Id.*

- John Doe B was deemed medically ineligible because his current diagnosis of Bipolar Disorder, history of multiple psychiatric hospitalizations, and active prescription of Latuda—and potential side effects that would require immediate treatment—led the Peace Corps to conclude that it was "unable to provide the level of psychiatric monitoring needed" during service.  Ex. 2-B.

- The Peace Corps determined that it was unable to provide John Doe C "with a level of health care that [it] deem[ed] necessary and appropriate during service due to [his] active medication regimen of Duloxetine 60mg twice a day, Buspirone 20mg three times a day, Doxepin 100mg three times a day, Buprenorphine three times a day, and

---

[10] "John Doe C" in the First Amended Complaint is a different individual than the "John Doe C" who appeared in the original complaint in this matter.  *See* Pls.' Sealed Mot. to Proceed Under Pseudonym, ECF No. 19.  The original John Doe C is no longer a plaintiff; he has been replaced by the current John Doe C.  *Compare id.* (identifying current plaintiffs) *with* Pls.' Sealed Mot. to Proceed Under Pseudonym, ECF No. 2 (identifying plaintiffs in original complaint).

Ritalin 40mg twice a day." Ex. 2-C. The Peace Corps explained that the direct and indirect risks associated with these medications were incompatible with service in an austere environment. *Id.*

- The reason for Jane Doe A's medical non-clearance is that she was "currently diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, Persistent Depressive Disorder, Panic Disorder and history of self-harm and suicide attempt"; although her provider had noted that her symptoms of depressed mood, panic attacks and anxiety became managed in 2019, those symptoms had recurred in January 2022—just months prior to when she sought medical clearance. Ex. 2-D.

- Peace Corps was unable to clear Jane Doe B for service due to her "active medications of Lamotrigine 450mg for Major Depressive Disorder and Adderall 30mg twice daily for ADHD." Ex. 2-E. Peace Corps explained that it "adheres to FDA approval for psychotropic medications," and that "[w]hile both you and your provider have indicated that you have experienced a beneficial response regarding Lamotrigine, it is not currently FDA approved as a monotherapy for the treatment of Major Depressive Disorder." *Id.* Further, her dosage of Adderall "exceed[ed] the recommended maximum dosage of 40mg daily," and Peace Corps was "unable to support this medication at the above maximum recommended dosage while in service." *Id.*

- Peace Corps determined that it was unable to provide Jane Doe C with a level of health care that it deemed necessary and appropriate during service due to her "active psychiatric regimen of bupropion and desvenlafaxine with history of dual benzodiazepine use," and her particular dosage. Ex. 2-F. "[T]his dosage range may exacerbate symptoms of anxiety and panic" and "can also contribute to dose-dependent diastolic hypertension, which can place you at increased safety risks while in service." *Id.* Given Jane Doe C's "prolonged anxiety and insomnia, with a recent recurrence within the past year," and the high risk of exacerbation of those conditions in Peace Corps service, the Peace Corps "recommended that a longer period of remission of symptoms is established prior to service." *Id.*

- The reason for Jane Doe D's medical non-clearance is that she was "currently experiencing intermittent depression symptoms and have chronic suicidal thoughts." Ex. 2-G. She "reported that since [her] onset of depression in 2014 [she] will randomly have a recurrence of fatigue, anhedonia, and passive suicidal ideation for a few weeks every couple of months." *Id.* Peace Corps "assessed the limited health care resources available where Peace Corps Volunteers are assigned within Costa Rica, and determined that there are not adequate or appropriate mental health care and psychiatric resources to effectively support [her] current conditions." *Id.*

- With respect to Jane Doe E, Peace Corps considered "the nature and location of the specific assignment for which [she] applied"—a Peace Corps Response Volunteer position with the Global Health Services Partnership—and concluded that "proper and safe management of [her] condition exceed[ed] the limitations of Peace Corps' medical resources in the country of your assignment." Ex. 2-H. "Given the individual concerns of [her] case, [Peace Corps] recommend[ed] a period of 1 year passing since the mutual and appropriate termination of care and without active symptoms to demonstrate that concerns have appropriately resolved without further issue" prior to service. *Id.*

Each Plaintiff appealed his or her non-clearance determination to the Pre-Service Review

Board, which upheld the initial determination in each case.  Am. Compl. ¶¶ 65, 87, 112, 135, 157, 180, 202, 224.  Thereafter, they each filed administrative complaints of discrimination with the Peace Corps' OCRD.  *Id.* ¶¶ 72, 95, 120, 143, 165, 188, 210, 232.  One Plaintiff (Jane Doe E) received a Final Agency Decision dismissing her discrimination claim.  *Id.* ¶ 233.  The others did not wait for the administrative process to be complete before filing this suit.  *Id.* ¶¶ 74, 96, 121, 144, 166, 189, 211.

### D.  Procedural History

This case was initially filed as a class action on September 26, 2023.  Compl., ECF No. 1. After Peace Corps filed its first motion to dismiss, Plaintiffs filed an amended complaint removing the prior class claims, adding APA claims, and changing and adding Plaintiffs.  Am. Compl., ECF No. 18-1; *see also* ECF 18-2 (redline showing changes from the initial Complaint).  The amended complaint asserts one claim under Section 504 of the Rehabilitation Act, Am. Compl. ¶¶ 298–308 (first claim for relief), and three claims under the APA, which allege that Defendant violated the APA by: (a) engaging in disability discrimination against the Plaintiffs, *id.* ¶¶ 309–25 (second claim for relief); (b) employing a "substantive or *de facto* rule" in the form of screening guidelines that did not undergo notice-and-comment rulemaking, *id.* ¶¶ 326–35 (third claim for relief); and (c) unlawfully withholding or unreasonably delaying agency action because the Peace Corps' administrative processing of seven of the Plaintiffs' discrimination complaints remained ongoing at the time of the filing of the First Amended Complaint, *id.* ¶¶ 336–45 (fourth claim for relief). Peace Corps now moves to dismiss the complaint in full, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARDS

A Rule 12(b)(1) motion tests this Court's subject-matter jurisdiction.  "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), . . . [a] 'plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'"  *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007)

(citations omitted).  In determining whether it has jurisdiction, the Court may consider materials outside of the pleadings.  *Kareem v. Haspel*, 986 F.3d 859, 867 n.7 (D.C. Cir. 2021).  "Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence."  *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 257 (D.D.C. 2013).

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562–63 (2007).  When deciding a Rule 12(b)(6) motion, the court may consider only the allegations in the complaint, documents attached to or incorporated by reference in the complaint, and judicially noticeable materials.  *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624.  The court "must treat the complaint's factual allegations as true and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted).  Nevertheless, the Court need not accept inferences drawn by the Plaintiffs if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept Plaintiffs' legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Nor must the court "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (quoting *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004)).

## ARGUMENT

### I.    Jane Doe E's claims should be dismissed as moot.

Plaintiffs allege that "[i]n or about October 2016, Plaintiff Jane Doe E applied for a Peace Corps Response Volunteer position with the 2017 Global Health Services Partnership."  Am. Compl. ¶ 217.  That program was a public-private partnership to place nurses, physicians, and other health professionals as adjunct faculty in medical or nursing schools overseas.  The Global Health Services Partnership, however, ended in 2018.  Ex. 1, Kerry, et al. (2022) at 920 ("GHSP

was federally funded from 2013–2018.").[11]  The program no longer exists and there is no allegation or evidence that it will soon, or ever, be renewed.  Because Jane Doe E's claims arise from her application to a program that no longer exists, the Court cannot provide effective relief, and her claims are moot.

Mootness is jurisdictional, arising from the "case or controversy" requirement of Article III.  *Honig v. Doe*, 484 U.S. 305, 317 (1988).  "[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  As relevant here, "[a] case becomes moot when intervening events make it impossible to grant the prevailing party effective relief."  *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (quotation omitted).  Here, the Court cannot fashion effective relief because even if the Court were to reverse the Peace Corps' medical qualification determination with respect to Jane Doe E, she could obtain no benefit from such a ruling because the specific Peace Corps program to which she applied no longer exists.  *Cf. Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (case mooted when construction project at center of Establishment Clause dispute was cancelled).[12]

To the extent that Jane Doe E is interested in participating in a different Peace Corps program, her claims are not ripe.  A claim is not ripe if it is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Trump v. New York*, 592 U.S. 125, 131 (2020) (quotation omitted).  Jane Doe E's application to the Global Health Services Partnership was submitted nearly eight years prior to the filing of the amended complaint, and there is no allegation that she has applied to—and been denied a position in[13]—a current program

---

[11] The Court may consider materials outside of the pleadings when deciding a jurisdictional matter. *Kareem*, 986 F.3d at 867 n.7.

[12] Alternatively, Jane Doe E lacks standing because her alleged injury is not "redressable by a favorable decision of the court." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 408 (D.C. Cir. 2024).  A plaintiff must demonstrate standing "for each claim ... and for each form of relief that is sought." *Id.*  But as another D.D.C. court observed, "[i]t makes no difference . . . that the pending motion is framed in terms of standing, as opposed to mootness; both doctrines require the same personal stake in a claim and simply differ in whether that assessment is made at the outset or during the course of the litigation." *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 228 (D.D.C. 2017).

[13] Jane Doe E previously served as a Peace Corps volunteer in the Philippines.  Am. Compl. ¶ 217.

of the Peace Corps. Attempting to account for future issues Jane Doe E might face, for programs for which she has not applied, would require unwarranted speculation. *See id.* Thus, any claim Jane Doe E may be attempting to bring with respect to future participation in a different Peace Corps position than the no-longer-existing position to which she applied is not ripe and should be dismissed.

## II.    Whether brought pursuant to the Rehabilitation Act or the APA, Plaintiffs' discrimination claims should be dismissed because they failed to exhaust their administrative remedies.

As of the time of the filing of the First Amended Complaint, and continuing to date, Jane Doe E is the only Plaintiff who has received a final agency decision. Am. Compl. ¶ 51. The discrimination claims of the other seven Plaintiffs should be dismissed for failure to exhaust their administrative remedies through the detailed process established by Peace Corps.

Whether the appropriate cause of action is found in the APA or the Rehabilitation Act, the Peace Corps' regulations require Plaintiffs to follow its administrative procedures for pursuing allegations of discrimination. *See* 22 C.F.R. §§ 306.1–306.10. The APA expressly provides for review only of "final agency action[s]," 5 U.S.C. § 704, and plaintiffs in APA suits must exhaust administrative remedies where those procedures are made mandatory by regulation. *Darby v. Cisneros*, 509 U.S. 137, 147 (1993). The "doctrine of exhaustion" also extends beyond APA challenges. It is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938); *see also Darby*, 509 U.S. at 153 (noting that the APA did not eliminate general "limitation[s] on judicial review," including "exhaustion doctrine[s]").

With respect to a challenge to a federal agency "program or activity," such as the one that Plaintiffs are attempting to bring here,[14] Section 504 of the Rehabilitation Act contains neither an express cause of action nor an express exhaustion requirement. Where a statute does not expressly

---

[14] As discussed in Section III below, Plaintiffs fail to state a claim under the Rehabilitation Act.

require administrative exhaustion, "sound judicial discretion governs." *Nat'l Treasury Emps. Union v. King*, 961 F.2d 240, 243 (D.C. Cir. 1992) (quoting *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501 (1982)). Were the Court to find that the Rehabilitation Act implies a private right of action, it should also require exhaustion. *See Cooke v. U.S. Bureau of Prisons*, 926 F. Supp. 2d 720, 731–34 (W.D.N.C. 2013); *Pereira v. U.S. Dep't of Just.*, No. 16-cv-2599, 2016 WL 2745850, at *19 n.17 (S.D.N.Y. May 11, 2016). After all, with respect to agency programs and activities, Section 504(a) directs agency heads to "promulgate such regulations as may be necessary to carry out" the Rehabilitation Act's discrimination prohibitions. 29 U.S.C. § 794(a). Peace Corps has issued regulations establishing procedures for aggrieved applicants for Peace Corps service to follow to pursue allegations of discrimination. Requiring exhaustion here would "serve[] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992) (superseded by statute on other grounds); *Malladi Drugs & Pharms., Ltd. v. Tandy*, 552 F.3d 885, 891 (D.C. Cir. 2009).

The seven Plaintiffs who have not exhausted their administrative remedies filed formal complaints with Peace Corps' OCRD, alleging discrimination, as they were required to do under the Peace Corps' discrimination procedures regulation, 22 C.F.R. §§ 306.8–306.9. Am. Compl. ¶ 72 (John Doe A); *id.* ¶ 95 (John Doe B); *id.* ¶ 120 (John Doe C); *id.* ¶ 143 (Jane Doe A); *id.* ¶ 165 (Jane Doe B); *id.* ¶ 188 (Jane Doe C); *id.* ¶ 210 (Jane Doe D). But none of them waited to receive a final agency action before filing suit. *Id.* ¶¶ 74, 96, 121, 144, 166, 189, 211. Instead, Plaintiffs seem to have jumped into court because more than 180 days had elapsed.[15] Plaintiffs must instead complete the administrative process by exhausting their administrative remedies in accordance with 22 C.F.R. §§ 306.1–306.10.[16]

---

[15] Peace Corps volunteers and volunteer applicants are not federal employees, 22 U.S.C. § 2504(a), and so the more general 180-day right to file in federal court applicable to federal employees does not apply to Plaintiffs. *See* 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 794a(a)(1).

[16] Plaintiffs take advantage of the duration of OCRD reviews when it suits them. They claim that the initial denial of Jane Doe E's appeal, dated April 20, 2017, was "final agency action," but unless Plaintiffs rely on the final agency decision from OCRD dated August 29, 2018, Jane Doe E would fall outside the statute of limitations. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv.*

Plaintiffs protest that requiring exhaustion of administrative remedies would be futile.  *See* Am. Compl. ¶¶ 293, 306, 323.  Not so.  As an initial matter, futility does not obviate the finality requirement under the APA.  *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 173 F. Supp. 2d 41, 51 (D.D.C. 2001) ("[F]utility alone does not excuse the need for final agency action[.]"), *aff'd*, 324 F.3d 726 (D.C. Cir. 2003); *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  As a matter of exhaustion, Plaintiffs' well-pled allegations do not demonstrate futility warranting immediate diversion to federal court.  Their contention that Peace Corps' screening guidelines dictate a negative administrative result is contradicted by the face of those documents:  The guidelines are non-binding and do not guarantee any particular result.  *See* infra, Section IV(B).  And regardless, the guidelines address determinations of an applicant's medical qualification, not whether they experienced discrimination.  Further, even if Plaintiffs are aware of "thirty individuals" that they allege were "improperly denied medical clearances," Am. Compl. ¶ 292, without information about the total number of people with mental health conditions *considered* for medical clearance, that number means very little.  Plaintiffs do not even say how many of the alleged thirty individuals have completed the administrative process; we know that at least seven (all of the named Plaintiffs but one) have not.  Plaintiffs' allegations are not enough to determine that administrative remedies for all Plaintiffs are certain to fail, as required by precedent.  *Tesoro Refin. & Mktg. Co. v. Fed. Energy Regul. Comm'n*, 552 F.3d 868, 874 (D.C. Cir. 2009) ("[E]ven if one were to concede that an unfavorable decision . . . was *highly likely*, that does not satisfy our strict futility standard requiring a certainty of an adverse decision.") (quotation omitted) (emphasis in original).  Finally, Plaintiffs' assertions that "no exhaustion is required . . . because any further pursuit of administrative process would be futile," *see, e.g.*, Am. Compl. ¶ 306, are legal conclusions that cannot be credited.  *See Browning*, 292 F.3d at 242.

In light of the comprehensive remedial scheme set forth in the Peace Corps' regulations, Plaintiffs' failure to exhaust these procedures should not be excused.  *See Cooke*, 926 F. Supp. 2d

---

*Sys.*, 144 S. Ct. 2440 (2024) (APA statute of limitations is six years; claim accrues when the plaintiff is injured by final agency action); *Abreu v. Howard Univ.*, 93 F.4th 498, 502 (D.C. Cir. 2024) (in the District of Columbia, Rehabilitation Act statute of limitations is three years).

at 731–34 (analyzing similar regulations promulgated by the Department of Justice and concluding that a plaintiff must first exhaust administrative remedies even if Section 504 implies a cause of action against the agency for its non-funding activities). Plaintiffs must provide the agency the opportunity to correct its own errors, if any, by exhausting their administrative remedies in accordance with the agency's regulations, thereby creating a final agency decision for review by the district court. *See Parisi v. Davidson*, 405 U.S. 34, 37 (1972) (among other things, exhaustion allows an agency "to correct its own errors so as to moot judicial controversies").

## III.    Plaintiffs fail to state a claim under the Rehabilitation Act.

Plaintiffs' first claim for relief—their Rehabilitation Act claim—covers both Plaintiffs' challenges to their individual non-clearance determinations and their broader assertions regarding the Peace Corps' allegedly discriminatory "policies and practices."[17] Am. Compl. ¶¶ 298–308. This claim should be dismissed for failure to state a claim for two reasons. First, the Rehabilitation Act does not create a private cause of action for Section 504 claims against the Peace Corps under these circumstances. And second, the Peace Corps Act precludes a direct application of the Rehabilitation Act to the Peace Corps.

### A.    Congress did not create a private, non-administrative cause of action under the Rehabilitation Act to sue a federal agency for non-employment, non-funding decisions.

The Rehabilitation Act prohibits discrimination (1) by federal agencies in their capacity as employers, 29 U.S.C. § 791; (2) by recipients of federal funds and federal agencies in their capacity as funders, *id.* § 794(a); and (3) by federal agencies in their capacity as the operators of their own "program[s] or activit[ies]," *id.*[18] Congress provided express remedies, including private rights of

---

[17] Plaintiffs' second claim for relief similarly attempts to challenge both their individual non-clearance determinations and the Peace Corps' policies and practices, but does so under the alternative guise of the APA. *See* Section IV(D), infra; Am. Compl. ¶¶ 309–25.

[18] 29 U.S.C. § 791 codifies Section 501 of the Rehabilitation Act, as amended, and is often referred to as "Section 501"; 29 U.S.C. § 794(a) codifies Section 504 of the Rehabilitation Act, as amended, and is often referred to as "Section 504." *See* Rehabilitation Act of 1973, Pub. L. No. 93-112, §§ 501, 504, 87 Stat. 355, 390, 394.

action, to enforce the first two prohibitions, but not the third. *Id.* § 794a.[19]  Particularly when viewed in light of the Supreme Court's guidance regarding implied private rights of action, *see, e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264–65 (2018), that omission strongly suggests that no private right of action exists, even though the D.C. Circuit has not decided whether the Rehabilitation Act contains an implied right of action in this circumstance and courts in this district are split on the question.  *Compare Nat'l Ass'n of the Deaf v. Trump ("NAD")*, 486 F. Supp. 3d 45, 55–56 (D.D.C. 2020) (Boasberg, J.) (finding an implied a private right of action against federal programs and activities), *with Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015) (Moss, J.) (concluding that "the cause of action for a substantive claim of disability discrimination in a federal program or activity arises . . . under the APA," not the Rehabilitation Act).  Given the express causes of action otherwise outlined in 29 U.S.C. § 794a,[20] the Court should follow *Sai*, the weight of circuit court authority, and related Supreme Court case law by holding that the Rehabilitation Act does not include an implied right of action to sue a federal agency in its capacity as operator of a federal program or activity.

The Supreme Court has clarified that "when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent."  *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).  The judicial task is "limited

---

[19] 29 U.S.C. § 794a codifies Section 505 of the Rehabilitation Act, as amended, and is often referred to as "Section 505."  Section 505 was added to the Rehabilitation Act in 1978.  *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978 ("Rehabilitation Act Amendments of 1978"), Pub. L. No. 95-602, § 120(a), 92 Stat. 2955, 2982.

[20] The express cause of action provided by Section 505(a)(1), 29 U.S.C. § 794a(a)(1), pertains to claims by federal employees under Section 501, 29 U.S.C. § 791.  Plaintiffs are unable to rely on this express cause of action because Peace Corps volunteers are not federal employees.  22 U.S.C. § 2504(a).

The express cause of action provided by Section 505(a)(2) pertains to claims brought by persons aggrieved by "any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance" under Section 504, 29 U.S.C. § 794a(2).  Plaintiffs are unable to rely on this cause of action because the Peace Corps is not a "Federal provider" of financial assistance with respect to the Peace Corps volunteer program, which the agency itself administers.  *See Lane v. Pena*, 518 U.S. 187, 195 (1996) ("The Department of Transportation … is not a 'Federal provider' of financial assistance *with respect to the Merchant Marine Academy*, which the Department itself administers.").  The Rehabilitation Act does not include an express cause of action for claims brought by persons aggrieved by "any program or activity conducted by any Executive agency" under Section 504, 29 U.S.C. § 794(a).

solely to determining whether Congress intended to create the private right of action asserted." *Id.* (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979)). "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Id.* The Supreme Court's jurisprudence in this respect has changed over time. In the 1970s and 1980s, "the Court often assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 334 (2020) (cleaned up). But "[w]ith the passage of time," the Court has "come to appreciate that like substantive federal law itself, private rights of action to enforce federal law must be created by Congress and raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Id.* (cleaned up). The Supreme Court has more "recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Jesner*, 584 U.S. at 264 (citation omitted); *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("At bottom, creating a cause of action is a legislative endeavor.").

Section 504 of the Rehabilitation Act originally applied only to recipients of federal funds. Congress amended the statute in 1978 to apply to a federal agency acting in its programmatic capacity. The 1978 amendments added the following language to the prohibition on disability discrimination in Section 504:

> or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

*See* Rehabilitation Act Amendments of 1978, § 119, 92 Stat. at 2982. Congress did not include an express cause of action to enforce this provision. To enforce Section 504 rights against a federal program, an aggrieved person can seek a remedy through the administrative pathway that Congress directed agencies to create and then, if necessary, seek judicial review through the Administrative

Procedure Act.  *See id.*; 5 U.S.C. § 702.

At the same time Congress amended Section 504, it also created limited, express causes of action in Section 505 of the Rehabilitation Act that did not include an express private right of action regarding the non-funding, non-employment activities of federal agencies.  *See* Rehabilitation Act Amendments of 1978, § 120(a), 92 Stat. at 2982–83 (adding Section 505 to the Rehabilitation Act of 1973).  Notably, while the new Section 505 authorizes specific remedies through direct cause of action for any Section 504 violation committed by a *non-federal* recipient of federal funds or by a federal agency that provides such funds, it does not create such remedies for disability discrimination under any programs or activities conducted by a federal agency.  Congress knows how to create a private right of action, and while it directed agencies to "promulgate such regulations as may be necessary to carry out the amendments" to Section 504, it created a private right of action only for employment issues and federal agencies' funding activities.  29 U.S.C. §§ 794(a), 794a(a).  It is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."  *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979).  Congress provided that Section 504 would apply to non-funding activities of the federal government, and agencies would need to promulgate regulations, but Congress affirmatively chose to create a cause of action for violations of the Rehabilitation Act only for employees and persons aggrieved by recipients of federal assistance or a federal provider of such assistance.  It follows that Congress intended challenges to non-funding activities of the federal government to be brought through the administrative pathway.  *See Wisher v. Coverdell*, 782 F. Supp. 703, 707 (D. Mass. 1992) ("[T]here was no need for Congress to create a private right of action because a means of review [under the APA] already existed.").

Indeed, when the Supreme Court was confronted with the Rehabilitation Act's statutory language in a different context, it found it "telling" that Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] conducted by any Executive agency,' the plainly more far-reaching language Congress employed in § 504(a) itself."  *Lane*, 518 U.S. at 192–93 (1996) (addressing the question of whether the government had waived sovereign immunity for money damages for a

violation of Section 504 of the Rehabilitation Act) (citation omitted); *see also id.* at 197 ("As the Government puts it, '[w]here a cause of action is authorized against the federal government, the available remedies are not those that are 'appropriate,' but only those for which sovereign immunity has been expressly waived.'") (citation omitted); *id.* at 193 ("Congress did not intend to treat all § 504(a) defendants alike with regard to remedies."). In *Lane*, the Supreme Court held that Congress, in amending the Rehabilitation Act to cover federal programs and activities, did not intend to waive the United States's sovereign immunity for suits for money damages. *See id.* at 189, 200.

The question at issue here—whether the cause of action for a substantive claim of disability discrimination in a federal program or activity arises under the Rehabilitation Act or under the APA—was not addressed in *Lane*. That is "because, as the Solicitor General noted in his brief [in *Lane*], 'resolution of the source of the cause of action, be it under Section 504(a) directly or the APA, would . . . not [have] alter[ed] the outcome of [that] case' as long as Section 504(a) was not read to waive sovereign immunity for monetary damages." *Sai*, 149 F. Supp. 3d at 113 (quoting Br. for the Resp'ts, *Lane v. Pena*, No. 95–365, 1996 WL 115795, at *27 n.17 (S. Ct. Mar. 15, 1996)).

Although the D.C. Circuit has not directly addressed the question, the weight of circuit authority supports the lack of a private cause of action under Section 504 for federal programs or activities. Three circuits have adopted that view, including the en banc First Circuit in an opinion by then-Judge Breyer. *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc) (Breyer, J.) ("[t]here is no reason to strain to find an implied right of action against federal agencies under § 504" because "the APA's review procedures" are available). Only the Ninth Circuit has disagreed, and it did so based on the premise—inconsistent with the Supreme Court's later decision in *Lane*—that a right of action under Section 504 was needed to ensure that plaintiffs could secure "money damages." *J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 268 (9th Cir. 1992), *disapproved of by Lane*, 518 U.S. at 191.

Courts in this district are split on the question. In *Sai*, Judge Moss concluded that there is no cause of action under the Rehabilitation Act for discrimination in federal programs and activities,

and that Congress intended for the rights created by Section 504 to be enforceable through judicial review of agency action under the APA.  149 F. Supp. 3d at 113.  First, the court noted that the Supreme Court "has repeatedly cautioned courts not to imply causes of action in the absence of evidence that Congress intended 'to create not just a private right but also a private remedy.'"  *Id.* (quoting *Sandoval*, 532 U.S. at 286).  In considering the statutory text and structure, the court found "relatively little evidence that Congress intended to create a private cause of action under the Rehabilitation Act to enforce" the substantive rights regarding federal programs and activities contained therein.  *Id.*  Judge Moss observed that Section 505 expressly specifies the remedies available to some persons aggrieved under Section 504 but "says nothing about the remedies available to a person aggrieved by discrimination in a 'program or activity conducted by an[ ] Executive agency.'"  *Id.* (quoting 29 U.S.C. § 794(a)).  Second, Judge Moss reasoned that Congress has "no need to provide for a cause of action that is independent of the APA" "when it intends to permit only declaratory and injunctive relief" to enforce a statute.  *Id.* at 114.  Third, Judge Moss court found the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* persuasive.  *Id.* at 114–15 (discussing *Cousins*, 880 F.2d at 605–08; *Clark*, 937 F.2d at 125–26).  On these bases, *Sai* concluded "that the Rehabilitation Act does not provide an implied cause of action for discrimination in federal programs and activities (or for failure to comply with administrative procedures), but that the APA provides a cause of action to challenge final agency action that is not in accordance with the Rehabilitation Act."  *Id.* at 115.  Judge Moss's reasoning should be followed here.

In *NAD*, Judge Boasberg reached a contrary conclusion and found that Section 504 includes an implied cause of action to sue Executive branch agencies for federal programs and activities.  *NAD*, 486 F. Supp. 3d at 54.  Judge Boasberg reasoned that Congress did not expressly "direct[ ] those plaintiffs who seek relief from Executive agencies' violations of Section 504 to rely on the Administrative Procedure Act."  *Id.*  But the court did not explain why it would have been necessary (or even important) for Congress to do so.  *See id.*  The APA itself provides that anyone "adversely affected or aggrieved by agency action within the meaning of a relevant statute" can obtain review of "agency action" pursuant to the APA.  5 U.S.C. § 702.  Given the APA's general cause of action,

it would have been unnecessary for Congress to additionally specify in the Rehabilitation Act that plaintiffs challenging the federal government's compliance with Section 504 in the government's non-funding activities could bring suit under the APA.[21]    Additionally, Judge Boasberg's *NAD* decision relied on several cases in this district analyzing whether the Rehabilitation Act waives the government's sovereign immunity, or standing for the proposition that declaratory and injunctive relief was available, but those cases did not address the separate question of whether the available cause of action lies within the Rehabilitation Act itself or the APA.  486 F. Supp. 3d at 55–56 (citing *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *Lane v. Pena*, 867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part*, 518 U.S. 187, 190–91 (1996); and *Doe v. Dist. of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992)).  Finally, *NAD* distinguished the First Circuit's and Fourth Circuit's opinions in *Cousins* and *Clark* on the dubious basis that those cases "dealt with Executive agencies' acting as a *regulator*, as opposed to in a substantive capacity."  486 F. Supp. 3d at 56 (emphasis in original).  But *Cousins* and *Clark* made clear that their holdings apply to "any program or activity conducted by any Executive agency," 29 U.S.C. § 794(a).  *Cousins* explained that the category of "any program or activity conducted by any Executive agency" "presumably includ[ed] regulatory programs," 880 F.2d at 605; the *Cousins* court did not purport to limit its reasoning to regulatory actions as opposed to non-funding actions more generally.  *Cousins* used the phrase "as regulator" to describe the government's non-funding activities because the plaintiff in that case challenged a Department of Transportation rule.  *See id.* at 604, 605.  The same is true in *Clark*, which also involved a challenge to a Department of Transportation rule.  937 F.2d at 125.  Contrary to *NAD*'s suggestion, the sound analysis of *Cousins* and *Clark* applies equally to any non-funding, non-employment "program or activity conducted by any Executive agency," 29 U.S.C. § 794(a), regardless of whether a regulatory or programmatic activity is at issue.

---

[21] The plaintiffs in *NAD* did not have a judicial remedy available to them under the APA, as Judge Boasberg noted, because the defendants in that case, which included the White House, were not "agencies" subject to the APA.  486 F. Supp. 3d at 57.

*NAD*'s distinction between agencies acting in a "regulatory" versus "substantive" capacity does not hold up because the statutory text of the Rehabilitation Act does not distinguish along these lines. Section 504(a) contains a single category of "any program or activity conducted by any Executive agency or by the United States Postal Service." *Id.* Section 505(a)(2) creates a sub-category by allowing a private cause of action for federal activities that involve the provision of federal financial assistance. *Id.* § 794a(a)(2). Section 505(a)(1) allows a private cause of action for another category applicable to the federal government: employment. *Id.* § 794a(a)(1). But the Rehabilitation Act does not distinguish among federal programs and activities based on whether they are "regulatory" or "substantive" in nature. *See id.* § 794(a).

The conclusion that the Rehabilitation Act does not imply a private right of action for the government's non-funding, non-employment activities is "buttressed by the fact that Congress expressly provided two alternative mechanisms to enforce the prohibition against discriminatory agency action." *Moya*, 975 F.3d at 128. First, Section 504(a) directs agency heads to "'promulgate such regulations as may be necessary to carry out the'" prohibition against discrimination in programs and activities conducted by the agency. *Id.* (quoting 29 U.S.C. § 794(a)). Second, the APA provides an express cause of action for plaintiffs who wish to sue an executive agency for violating the Rehabilitation Act. "The availability of these alternative mechanisms to enforce the Rehabilitation Act strongly suggests that Congress did not intend to imply a superfluous private right of action." *Id.*; *see also Clark*, 937 F.2d at 126 ("[T]he APA was intended to provide a single uniform method for review of agency action and . . . an implied private right of action to enforce a federal statute against a federal regulatory agency is unnecessary.").

Plaintiffs' claims in essence request review of agency action, and the Administrative Procedure Act provides the proper avenue for their review. As the court found in *Wisher v. Coverdell* when considering this exact type of claim against the Peace Corps, the Peace Corps' denial of medical clearance is "the type of decision for which APA review is available and appropriate," 782 F. Supp. at 708, and review under Section 504 is unavailable, *see id.* at 710.

**B. The Peace Corps Act precludes direct application of Section 504.**

Even if Section 504 could be read as implying a private right of action to sue a federal agency for its non-funding, non-employment actions, that cause of action still would not be available to Plaintiffs here. The plain language of the Peace Corps Act precludes direct application of Section 504 to the volunteer program, because the terms and conditions of enrollment of volunteers are "exclusively those" in the Peace Corps Act itself or adopted by the agency. Again, volunteer applicants may instead seek recourse through the Administrative Procedure Act because the Peace Corps has by policy adopted a prohibition on disability discrimination.

The Peace Corps is *sui generis* within the federal government. In establishing the Peace Corps, Congress recognized the unique nature of the agency and the foreign relations role it plays by vesting the President with substantial authority to determine who to enroll. The plain language of the statute makes clear that the "terms and conditions" of volunteer enrollment are "*exclusively those*" set forth in the Act and established by the President. 22 U.S.C. § 2504(a) (emphasis added). This language unambiguously signals Congress's intent that any limitations on the President's authority to enroll an applicant as a Peace Corps volunteer must be found either in the Peace Corps Act itself or in regulations or policies established by the President, through the Peace Corps Director. The use of the phrase "exclusively those" necessarily precludes direct application of, and a cause of action under, the Rehabilitation Act. "This follows from the plain meaning of 'exclusive,'" *Mississippi v. Louisiana*, 506 U.S. 73, 78 (1992), a term that "is so plain that little additional light can be gained by resort to the lexicons," *Mayor & Alderman of City of Vicksburg v. Vicksburg Waterworks Co.*, 202 U.S. 453, 470–71 (1906). "Exclusive[]" means that Congress intended to preclude other substantive laws from directly applying. *See id.* (recognizing that "exclusive" is defined as "[a]ppertaining to the subject alone; not including, admitting, or pertaining to any other or others; undivided; sole: as, an exclusive right or privilege; exclusive jurisdiction"); *Mississippi*, 506 U.S. at 77 (holding that a statute describing the Supreme Court's jurisdiction as "exclusive" necessarily meant that other federal courts were denied jurisdiction).

It is a "'basic principle of statutory construction that a specific statute . . . controls over a

general provision.'" *Sierra Club v. EPA*, 21 F.4th 815, 821 (D.C. Cir. 2021) (citation omitted).

Plaintiffs may argue that the later-enacted Rehabilitation Act operated to amend or repeal the

exclusive terms of the Peace Corps Act, but repeals by implication are disfavored.  Courts "will

not infer a statutory repeal unless the later statute expressly contradicts the original act or unless

such a construction is absolutely necessary in order that the words of the later statute shall have

any meaning at all." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007)

(cleaned up).  "Outside these limited circumstances, 'a statute dealing with a narrow, precise, and

specific  subject  is  not  submerged  by  a  later  enacted  statute  covering  a  more  generalized

spectrum.'"  *Id.* at 663 (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)).

Section 504 of the Rehabilitation Act does not expressly contradict the Peace Corps Act.  It does

not even mention the Peace Corps.  Nor is it necessary to construct Section 504 as applying directly

to the Peace Corps in order that the words of Section 504 "have any meaning at all."  *Id.* at 662

(citation omitted).  Section 504 and the Peace Corps Act can easily be harmonized by reading

Section 504 as applying directly to a broad swath of federal programs that do not include the

"narrow, precise, and specific" subject of the Peace Corps Act.  *See Mittleman v. Postal Regul.*

*Comm'n*, 757 F.3d 300, 306 (D.C. Cir. 2014) ("To eliminate the [potential] contradiction, the

specific provision is construed as an exception to the general one." (quoting *RadLAX Gateway*

*Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

The  exclusive  "terms  and  conditions"  provision  of  the  Peace  Corps  Act  is  similar  to

language in the Aviation and Transportation Security Act ("ATSA") that multiple courts of appeals

have held preempts the Rehabilitation Act as applicable to security screeners.[22]  ATSA provides:

"Notwithstanding any other provision of law, the Under Secretary of Transportation for Security

may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of

employment of Federal service for . . . individuals . . . to carry out the screening functions of the

_____

[22] The  ATSA  was  enacted  following  the  attacks  of  September  11,  2001,  and  established  the
Transportation Security Administration.  Like the Peace Corps Act does for the President (and his
designee, the Peace Corps Director) with respect to Peace Corps volunteers, the ATSA affords the
TSA Administrator discretion in developing employment standards for airport security screeners.

Under Secretary." ATSA, Pub. L. No. 107-71, § 111(d), 115 Stat. 597, 620 (2001), codified as note to 49 U.S.C. § 44935. The ATSA's use of the phrase "notwithstanding any other provision of law" is functionally equivalent to the "exclusively those" language employed by the Peace Corps Act, in that it indicates that the statute and implementing regulations exclusively set the terms and conditions for security screeners, overriding conflicting provisions of any other substantive federal law. Every circuit to have considered this provision has held, based on its plain language, that it precludes security screeners from bringing claims under the Rehabilitation Act. *Galaza v. Mayorkas*, 61 F.4th 669, 670 (9th Cir. 2023) (per curiam); *Kaswatuka v. U.S. Dep't of Homeland Sec.*, 7 F.4th 327, 330 (5th Cir. 2021); *Field v. Napolitano*, 663 F.3d 505, 512 (1st Cir. 2011); *Joren v. Napolitano*, 633 F.3d 1144, 1146 (7th Cir. 2011) (per curiam); *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1337 (11th Cir. 2006) (per curiam); *Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1383 (Fed. Cir. 2004). The logic of those cases extends to this one. By providing that the "terms and conditions" of Peace Corps volunteer enrollment and service shall be "exclusively those" provided in the Peace Corps Act "and those consistent therewith which the President may prescribe," 22 U.S.C. § 2504(a), Congress indicated its intent to exempt the Peace Corps from laws that otherwise would apply to volunteer positions and to give flexibility to the President to develop qualification standards for volunteers.[23] *See, e.g.*, *Conyers*, 388 F.3d at 1382; *Galaza*, 61 F.4th at 673.

While the plain language of the Peace Corps Act is clear enough, additional specific enactments post-dating the Rehabilitation Act confirm that Section 504 does not apply directly to the Peace Corps. The general Section 504 language—regarding programs and activities conducted by Executive agencies—that Plaintiffs seek to apply to the Peace Corps was added to the Rehabilitation Act in 1978.[24] The following year, Congress enacted the Domestic Volunteer Service Act Amendments of 1979. That act reauthorized funding for the service programs then

---

[23] This broad grant of authority is consistent with the Peace Corps' foreign relations purpose and the President's well-established constitutional role in the realm of foreign affairs. *See, e.g.*, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

[24] *See* Rehabilitation Act Amendments of 1978 § 119, 92 Stat. at 2982.

administered under the ACTION agency, including the Peace Corps.  And it contained a provision expressly applying the Rehabilitation Act to the Peace Corps:

> The Director shall apply the nondiscrimination policies and authorities set forth . . . in title V of the Rehabilitation Act of 1973 (29 U.S.C. [§§] 791 et seq.) . . . to applicants for enrollment for service as volunteers, and to volunteers serving, under . . . the Peace Corps Act (22 U.S.C. [§§] 2501 et seq.). Any remedies available to individuals under such law[] . . . shall be available to such applicants or volunteers.

Domestic Volunteer Service Act Amendments of 1979, Pub. L. No. 96-143, § 12(b), 93 Stat. 1074, 1079.  The next time the Domestic Volunteer Service Act was reauthorized, in 1984, the Peace Corps was deleted from this provision, such that the "remedies available" under the Rehabilitation Act were no longer available to Peace Corps applicants or volunteers, but they remained available to applicants or volunteers of the domestic service programs organized under ACTION, which as of December 1981 no longer included the Peace Corps.   Domestic Volunteer Service Act Amendments of 1984, Pub. L. No. 98-288, § 30(a), 98 Stat. 189, 197 (striking out "the Peace Corps Act (22 U.S.C. [§§] 2501 et seq.)" from the above-quoted provision).

The 1979 and 1984 amendments to the Domestic Volunteer Service Act confirm that any remedies of the Rehabilitation Act are not available to Peace Corps applicants and volunteers.  Had they been available from the time that Congress expanded the Rehabilitation Act in 1978 to apply generally to federal programs and activities, it would have been superfluous for Congress to expressly make the Rehabilitation Act remedies available to Peace Corps applicants and volunteers during the 1979 to 1984 time period.  *See Norwest Bank Minn. Nat. Ass'n v. FDIC.*, 312 F.3d 447, 451 (D.C. Cir. 2002) ("When both specific and general provisions cover the same subject, the specific provision will control, especially if applying the general provision would render the specific provision superfluous, as it would here."); *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) ("It is an elementary tenet of statutory construction that where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." (cleaned up)); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("A general statutory rule usually does not govern unless there is no more specific rule."); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957) ("Specific terms prevail over

the general in the same or another statute which otherwise might be controlling." (quotation omitted)).  The amendments to the Domestic Volunteer Service Act demonstrate that Congress did not intend the Rehabilitation Act to apply directly to Peace Corps volunteers outside of those amendments that were in effect from 1979 to 1984.

In sum, the plain language of the specific and narrowly drawn Peace Corps Act forecloses direct application of the more general Section 504.  The substantive terms and conditions of volunteer enrollment are set "exclusively" by the Peace Corps Act and the Peace Corps Director. Section 504 does not directly provide substantive standards for volunteer enrollment, nor does it provide a cause of action (implied or otherwise) for Peace Corps applicants.  Instead, the Peace Corps has adopted regulations prohibiting disability discrimination, and the Administrative Procedure Act remains available for applicants challenging their medical non-clearance.

## IV. Plaintiffs' attempted APA direct challenge to the Peace Corps' screening guidelines fails to state a claim.

Plaintiffs' third claim for relief purports to challenge the "Peace Corps' medical clearance criteria and screening guidelines" (referred to herein as "the Guidelines").  Am. Compl. ¶ 327. Plaintiffs assert that the Guidelines constitute a "substantive or *de facto* rule" that required notice-and-comment rulemaking.  *Id.* ¶ 331.  They also assert that the Guidelines are arbitrary and capricious and contrary to law.  *Id.* ¶¶ 331–32.  Additionally, Plaintiffs appear to include, in their second claim for relief, a broadly defined "pattern, practice, and/or policy" APA challenge to Peace Corps' medical clearance practices writ large.  *Id.* ¶¶ 316–19.

The Guidelines are not subject to APA review for three reasons.  First, the Guidelines do not constitute "agency action" under the APA.  Second, the Guidelines do not constitute "*final* agency action" under the APA.  And third, the Guidelines do not constitute a legislative rule that would require notice-and-comment rulemaking.  Ultimately, the Guidelines cannot be challenged under the APA because they are merely internal guidelines that provide a framework for—but do not determine the results of—medical clearance determinations.  Because Plaintiffs fail to allege

central elements of an APA claim, their third claim for relief should be dismissed. [25]  For the same reasons, the broadly defined "pattern, practice, and/or policy" APA claim included in Plaintiffs' second claim for relief should also be dismissed.

### A.  The Guidelines are not agency action subject to APA review.

First, Plaintiffs fail to demonstrate that the Guidelines are agency action.  The APA only allows judicial review where "[a] person [is] suffering legal wrong because of *agency action*, or [is] adversely affected or aggrieved by *agency action* within the meaning of a relevant statute."  5 U.S.C. § 702 (emphasis added).  Because the Guidelines are not themselves agency action, Plaintiffs' attempt to bring a facial challenge to the Guidelines under the APA cannot be sustained.

Under these circumstances, the reviewable agency actions are the medical clearance decisions and subsequent OCRD determinations—that is, the application of the Peace Corps' medical clearance policies to the facts underlying each Plaintiff's case.  To allow a suit challenging the Guidelines in the abstract—themselves only a part of the Peace Corps' overall policies—would be to countenance the sort of generalized, programmatic APA challenge that the Supreme Court has long discouraged.

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  The Supreme Court has emphasized that these categories "involve circumscribed, discrete agency actions."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *see also* 22 U.S.C. §§ 551(4), (6), (8), (10), (11) (defining each term).  As a result of the "agency action" requirement, plaintiffs "cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."

---

[25] Permitting a facial challenge to the Guidelines would also raise difficult questions of standing for each Plaintiff.  Plaintiffs who were medically non-cleared under older versions of the Guidelines do not necessarily have standing to challenge the current Guidelines.  Nor would any Plaintiff have standing to challenge the Guidelines for conditions other than the those that were applicable to his or her condition and application.  Given the fact-intensive nature of standing under these circumstances, Defendants will address these issues further, if necessary, at a later stage of the case upon consideration of the administrative records.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (emphasis in original).

Plaintiffs' third cause of action presents a facial challenge to an internal government resource[26]—not a challenge to application of that resource to any individual person. Plaintiffs' claim therefore fails for the reasons described in *RCM Technologies, Inc. v. U.S. Department of Homeland Security*, 614 F. Supp. 2d 39 (D.D.C. 2009). *RCM* involved an APA challenge to an alleged internal agency policy that allowed adjudicators of H-1B visas—available for qualified foreign nationals working in "specialty occupations"—to consider whether applicants had master's degrees. *Id.* at 42. The court held that plaintiffs' direct challenge to the alleged policy had "no likelihood of success on the merits . . . because they are challenging an alleged 'policy,' not the specific denial of a visa application made pursuant to that policy." *Id.* at 45. Because plaintiffs in that case "receive[d] notice of adjudicatory decisions made pursuant to [the agency's] alleged policy when visa applications [were] denied[,]" that was the proper (and only) vehicle for judicial review. *Id.* at 44. So too here. Plaintiffs have received or will receive a final agency decision on their claims, and that "case-by-case approach" is "the traditional, and remains the normal, mode of operation of the courts." *Id.* at 45 (quoting *Lujan*, 497 U.S. at 894).

As *RCM* recognized, interpreting *Lujan* to bar review of broad government policies absent application of the policy has not been squarely addressed by the D.C. Circuit. *Id.* at 44. In addition to Fifth Circuit precedent and an earlier D.D.C. case, the court relied on the D.C. Circuit's statement in dicta in *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001), which "noted that '[a]lthough the government does not press the issue,' the district court's holding that a 'policy' constitutes final agency action 'is questionable. While a single step or measure is reviewable, an on-going program or policy is not, in itself, a final agency action under the APA.'" *RCM Techs.*, 614 F. Supp. 2d at 44 (alteration in original) (quoting *Cobell*, 240 F.3d at 1095); *see also Sierra*

_____

[26] Even describing the Guidelines as a "policy" is a generous characterization. The Guidelines span numerous conditions. *See* Ex. 5. They contain not only shorthand considerations for evaluating applicants, but also descriptions of the medical conditions and resources for further study. Calling the Guidelines a consolidated "policy" is akin to suggesting the DSM-5 or other medical authorities that might be consulted by behavioral health reviewers constitute government "policy."

*Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000); *Arden Wood, Inc. v. USCIS*, 480 F. Supp. 2d 141, 149–50 (D.D.C. 2007); *Lujan*, 497 U.S. at 891 ("Under the terms of the APA, [a plaintiff] must direct its attack against some particular 'agency action' that causes it harm.").

        Not all decisions in this District have reached the same conclusion. *See Garcia v. Stewart*, 531 F. Supp. 3d 194, 212 (D.D.C. 2021) (documenting the split in authority).[27] The more permissive approach, allowing broader APA challenges to agency policies, relies on *Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015). In *Xie*, plaintiffs "alleged that the Department of State was violating the INA's temporal priority provision, 8 U.S.C. § 1153(e)(1), by maintaining an 'unannounced policy' that delayed the adjudication of certain Chinese work visas." *Garcia*, 531 F. Supp. 3d at 211 (citing trial court documents). The D.C. Circuit allowed the suit to move forward without distinguishing between the individual plaintiff's delayed adjudication and relief concerning all immigrant visa cases. *Id.*; *Xie*, 780 F.3d at 406. But *Xie* is distinguishable in at least two respects. First, *Xie* did not squarely address whether a claim that "only sought to put an end to the practice in all applications" could survive. *Garcia*, 531 F. Supp. 3d at 212. Second, *Xie* addressed a far more discrete alleged transgression than is at issue here. *Xie* noted that the plaintiff "points to a precise section of the INA, establishing a specific principle of temporal priority that clearly reins in the agency's discretion[.]" *Xie*, 780 F.3d at 408. That is, the alleged policy was directly at odds with a statutory mandate and therefore required little judicial oversight beyond reversing the policy. District courts that have cited *Xie* to apply the broader approach to justiciable "agency action" have followed a similar pattern. *See, e.g.*, *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018) (Plaintiffs "seek to compel an agency to take the discrete and concrete action of considering *statutorily specified factors* in determining where and how to place them." (emphasis added)); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Plaintiffs here attack particularized agency action—namely, ICE's consideration of an allegedly impermissible factor in making custody determinations.").

_____

[27] The court in *Garcia* ultimately sidestepped the issue due to "th[e] uncertainty," as the defendants in that case were "entitled to prevail on alternative grounds." *Garcia*, 531 F. Supp. 3d at 213.

The relief sought here is more nebulous.  Plaintiffs allege, for example, that the Guidelines reflect "outdated and unwarranted assumptions about the ability of people with mental health conditions to live and work abroad and under stressful conditions."  Am. Compl. ¶ 38.  Plaintiffs would therefore have the Court take on the intensive task of evaluating proper medical standards for individuals traveling abroad; to do so, the Court would not be able to look to a discrete statutory provision like the courts did in *Xie* and its progeny.  As a result, Plaintiffs' proposed path looks more like the "day-to-day agency management" that the Supreme Court has consistently reserved from the courts.  *Norton*, 542 U.S. at 66–67; *Lujan*, 497 U.S. at 899.  This court and others have credited the distinction between clear statutory obligation and the mere implementation of policy in continuing to apply the reasoning of *Cobell* post-*Xie*.  *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 32 (D.D.C. 2020) (Nichols, J.) ("Plaintiffs' claims ultimately are not a challenge to Defendants' failure to follow some clear statutory obligation, but instead a challenge to Defendants having exercised their discretion in implementing policies with which Plaintiffs disagree."); *see also C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 225–226 (D.D.C. 2020) (Cooper, J.) (citing *Cobell* and crediting the reasoning of *Nat'l Immigr. Project of Nat'l Laws. Guild*).

The Court should therefore dismiss the facial challenge to the Guidelines, and instead adjudicate the merits of Plaintiffs' individual determinations.  *See RCM Techs.*, 614 F. Supp. 2d at 46 ("Courts stand ready to entertain appeals from specific, concrete agency adjudications.  But absent that, courts have neither the resources nor the expertise to superintend agency policy-making.").

### B.  The Guidelines are not *final* agency action subject to APA review.

Second, the Guidelines are not "final agency action" subject to direct review under the APA because they do not determine any legal consequence.  *See* 5 U.S.C. § 704 (providing that "[a]gency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added)).  The agency does not characterize the Guidelines as binding, and all relevant factors suggest that the Guidelines are

at most a general statement of policy that informs the individualized assessment done by a physician reviewer and, if necessary, the Pre-Service Review Board. Because they provide only non-binding guidance, the Guidelines are not final agency action and Plaintiffs' claim should be dismissed.

To sufficiently allege that the Guidelines are reviewable "final agency action," Plaintiffs must demonstrate that they "mark the 'consummation' of the agency's decisionmaking process," and—more important here—that they are an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Expounding on the second prong of the *Bennett* test, the D.C. Circuit has explained that "[t]he distinction between 'general statements of policy' and 'rules' is critical." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006). To distinguish between a rule or "binding norm" with legal consequences and "an unreviewable statement of policy," courts should consider both the "effects of an agency's action" and the "agency's expressed intentions." *Id.* at 806 (citation omitted). The first line of inquiry considers "whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.'" *Id.* (alterations in original) (quoting *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C.Cir.2003)). The second considers "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Id.* at 806–07 (alteration in original) (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C.Cir.1999)).

Both lines of inquiry confirm that the Guidelines are at most a general statement of policy that is not reviewable. First, the "expressed intentions" line of inquiry strongly indicates a lack of final agency action. Each chapter of the Guidelines states in bold, capital letters: "THESE ARE GUIDELINES. EACH APPLICANT RECEIVES AN INDIVIDUAL REVIEW AND CLEARANCE STATUS IS ULTIMATELY UP TO THE CLINICAL JUDGMENT OF THE REVIEWER." *See, e.g.*, Ex. 5 at 1 (emphasis in original). And the Peace Corps manual similarly

35

makes clear that the Guidelines are just one tool among many that reviewers should use when making medical clearance determinations.  In determining whether an applicant is medically qualified for service—a requirement defined by regulation (22 C.F.R. § 305.4)—Peace Corps reviewers consider "information from the applicant and their physicians, current medical research, screening guidelines developed by OMS, knowledge and experience of the nature of Peace Corps service, and information about the scope of medical care available overseas."  Ex. 6, MS-262, 4.3(b).  The second and third factors are similarly straightforward.  As Plaintiffs recognize, the Guidelines are "internal Peace Corps documents."  Am. Compl. ¶ 328.  The Guidelines are not published in the Federal Register or the Code of Federal Regulations and they do not purport to bind or regulate private parties.

Plaintiffs fare no better under the "effects" line of inquiry.  Although not dispositive, "[t]he language used by an agency is an important consideration in such determinations."  *Ctr. for Auto Safety*, 452 F.3d at 806.  The Guidelines mean what they say: no rights or obligations flow from the Guidelines themselves.  It is only after an individualized review done by a medical, dental, or behavioral health advisor within the Office of Health Services—and if that advisor's decision is appealed, a determination by the clinician-led Pre-Service Review Board—that there is any final determination made.  Ex. 6, MS-262, 4.0.  Those individuals are the "decisionmakers free to exercise discretion," *Ctr. For Auto Safety*, 452 F.3d at 806, in determining whether a particular applicant is medically qualified.  *See also Marks v. Comm'r of Internal Revenue*, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991) ("It is well-settled, however, that the provisions of the [IRS field] manual are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law."); *Or. Nat. Res. Council v. Devlin*, 776 F. Supp. 1440, 1447 (D. Or. 1991) (collecting examples) ("Manual provisions and internal agency guidelines for implementing statutes are generally not binding on agencies.").

Indeed, Peace Corps personnel do not have the authority under the Peace Corps' regulations to give these guidelines the force of law.  The regulation for determining medical qualification provides that "an individualized assessment is required."  22 C.F.R. § 305.4(b).  Peace Corps' staff

cannot override this command with a cookbook approach to medical qualification that obviates individualized assessment. This lack of "authority to issue guidelines with binding effect" further "fortifie[s]" the conclusion that the Guidelines are at most a general statement of policy. *Ctr. for Auto Safety*, 452 F.3d at 810; *see also Food & Water Watch v. EPA*, 5 F. Supp. 3d 62, 83 (D.D.C. 2013) ("[T]he EPA's language cannot be mandatory because the CWA does not confer on the EPA the authority to command or to require the States to take specific actions.").

Plaintiffs' amended complaint appears to find fault in the fact that Peace Corps reviewers use the Guidelines when making medical clearance determinations. But that is no great scandal; general statements of policy are meant to be consulted and even relied upon. *See Sec. Indus. & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 422 (D.D.C. 2014) ("[T]he 'pressure to voluntarily conform' is part and parcel of many policy statements.") (citation omitted). Even "encourag[ing]" compliance with a policy statement does not render it a final agency action unless legal consequences necessarily follow. *Ctr. for Auto Safety*, 452 F.3d at 809; s*ee also RCM Techs., Inc.*, 614 F. Supp. 2d at 46 ("If a policy is 'permissive' or if officials are 'free to exercise their discretion' pursuant to the policy—even if officials are 'encouraged' to act a certain way—then 'rights or obligations' have not been determined." (citation omitted)). "Practical" consequences, as opposed to legal consequences, are not enough: "if the practical effect of the agency action is not a ***certain change*** in the legal obligations of a party, the action is non-final for the purposes of judicial review." *Ctr. for Auto Safety*, 452 F.3d at 811 (emphasis added) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005). Because the Guidelines have not "commanded, required, ordered, or dictated," *id.* at 809, they are not binding and cannot be final agency action.

### C. The Guidelines did not require notice-and-comment rulemaking.

Third, even if the Guidelines constitute "agency action" and "final agency action," they did

not require notice-and-comment rulemaking as alleged by Plaintiffs.[28]    In addition to the considerations discussed above, it is clear that the Guidelines are not an exercise of the agency's legislative power.

The APA provides that agencies must use notice-and-comment rulemaking to implement "substantive" rules.  *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) (citing 5 U.S.C. § 553(b)).  By contrast, the "notice-and-comment requirements . . . do not apply to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'"  *Id.* (quoting 5 U.S.C. § 553(b)).  Not only, then, must the challenged agency action be binding as a rule, it must also be a *legislative* rule that is "'issued by an agency pursuant to statutory authority' and has the 'force and effect of law.'"  *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 7 (2019) (citation omitted).  A rule has the force of law "only if Congress has delegated legislative power to the agency and [ ] the agency intended to exercise that power in promulgating the rule."  *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).  Moreover, a legislative rule must generally be binding not only within the agency but outside of the agency as well.  *See Splane v. West*, 216 F.3d 1058, 1064 (Fed. Cir. 2000) ("It is clear from *Chrysler* and *Guernsey* that the [Supreme] Court's reference to a regulation having the 'force and effect of law' is to the binding effect of that regulation on tribunals outside the agency, not on the agency itself.").

First, the Guidelines cannot be a legislative rule because they are not even binding within the agency, much less on anyone outside of the agency.  For the reasons discussed above, the Guidelines are not even a rule, do not carry the force of law, and therefore cannot require notice-and-comment rulemaking.  *Ctr. for Auto Safety*, 452 F.3d at 807 ("If the 1998 policy guidelines constitute a *de facto* rule, as appellants claim, then they would clearly meet *Bennett*'s test for final agency action.").  The permissive language used in the Guidelines themselves—including that

---

[28] The D.C. Circuit has described "final agency action" and *de facto* rules "that could not properly be promulgated absent [] notice-and-comment rulemaking" as "alternative ways of viewing the question," because the latter proposition would "implicitly prove" the former.  *Ctr. for Auto Safety*, 452 F.3d at 806.

"CLEARANCE STATUS IS ULTIMATELY UP TO THE CLINICAL JUDGMENT OF THE REVIEWER," Ex. 5 at 1—indicates that the agency did not intend the Guidelines to have the force and effect of law. *Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.*, 730 F. Supp. 2d 240, 245 (D.D.C. 2010) ("[A] good indication of a general policy statement is the agency's use of permissive, rather than binding, language; if the "rule" leaves the agency free to exercise discretion, it is likely a policy statement.").

Second, the Guidelines do not carry any of the traditional indicators of legislative rulemaking. The D.C. Circuit has noted the following considerations for determining whether a rule is legislative:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong.*, 995 F.2d at 1112. The second and third factors can readily be answered in the negative. The first and fourth factors depend on the Guidelines' relationship with the Peace Corps' regulation. *See* 22 C.F.R. § 305.4. As to the first factor, the regulation supplies the "adequate legislative basis" for the Peace Corps to make medical qualification decisions. The regulation sets out specific requirements for Peace Corps service, and provides that an applicant may seek review by a physician reviewer and then, if still unsatisfied, by the Pre-Service Review Board "composed of medical personnel." *Id.* § 305.4(e)(1). The *authority* for the Peace Corps decisionmakers thus comes from the regulation, not the Guidelines. Nor, turning to the fourth factor, do the Guidelines "amend" the regulation. The Guidelines are "irreconcilable" with the regulations, *Broadgate*, 730 F. Supp. 2d at 246, only under Plaintiffs' implausible reading of them. *See also id.* at 245 (holding internal memoranda was not legislative where there was "no evidence that it either binds USCIS adjudicators or requires a different outcome for third-party employers like Plaintiffs than the Regulation does.").

**D. Plaintiffs' broadly alleged "pattern, practice, and/or policy" APA challenge fails for the same reasons.**

Amid Plaintiffs' second claim for relief—APA challenges to their individual clearance determinations—they appear to include a broader challenge to an alleged "pattern, practice, and/or policies of denying medical clearance to Invitees in violation of Section 504 of the Rehabilitation Act." Am. Compl. ¶ 319. But any such challenge is precluded for the same reasons described above: Plaintiffs do not even attempt to identify a *discrete* agency action at the center of their challenge, much less a final agency action. *See id.* ¶¶ 316–19. The Court should therefore dismiss any broader "pattern, practice, and/or policies" APA challenge included in Plaintiffs' Complaint. *See Elk Run Coal Co. v. U.S. Dep't of Lab.*, 804 F. Supp. 2d 8, 30–31 (D.D.C. 2011) (holding "pattern and practice" allegations did not sufficiently plead an APA claim); *Inst. for Wildlife Prot. v. Norton*, 337 F. Supp. 2d 1223, 1229 (W.D. Wash. 2004) (rejecting Plaintiffs' attempt "to raise a pattern and practice claim that has been precluded by *Lujan*").

**V. Plaintiffs' claim for unreasonable delay fails to state a claim because the timetable for responding to discrimination complaints is discretionary.**

Plaintiffs' fourth claim for relief asserts that the Peace Corps' OCRD administrative decisions are being unreasonably delayed or unlawfully withheld under 5 U.S.C. § 706(1).[29] But as the amended complaint itself acknowledges, the time period for review of discrimination complaints is left to the discretion of the Peace Corps. The discretion afforded Peace Corps, in the context of the extremely high standard for relief under § 706, renders the length of the agency's investigation and deliberation unreviewable.

The APA places strict limits on judicial review of alleged agency inaction. Because the APA "carried forward" the common law writ of mandamus in § 706(1), the mandamus standards also apply to an APA claim of unreasonable delay. *Norton*, 542 U.S. at 63; *see also, e.g.*, *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010) ("[T]he standards for obtaining relief [through mandamus and through the APA] are essentially the same."). "To show entitlement

---

[29] The amended complaint refers repeatedly to "EEO complaints," which is a misnomer, as Peace Corps volunteers are not employees, and EEO processes do not apply to them. The relevant process is that provided for volunteer discrimination complaints. *See* 22 C.F.R. § 306.9.

to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). "The central question in evaluating a claim for unreasonable delay is whether the agency's delay is so egregious as to warrant mandamus," *In re Core Comm'cn, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quotation omitted)—"an extraordinary remedy" requiring "similarly extraordinary circumstances to be present before courts will interfere with an ongoing agency process," *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (citation omitted).

Plaintiffs have not and cannot demonstrate "a clear and indisputable right to relief," nor that Peace Corps is "violating a clear duty to act." *See Am. Hosp. Assn.*, 812 F.3d at 189. First, Plaintiffs have not identified any timetable required by statute. Neither the Peace Corps Act nor Section 504 of the Rehabilitation Act provides such a deadline. In the absence of "a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of its proceedings is entitled to considerable deference." *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). And second, the Peace Corps' duly promulgated regulation explicitly grants Peace Corps discretion to extend the timetable as needed:

> "(i) The investigator will compile a report of investigation (ROI) and forward the ROI to the OCRD Director. The OCRD Director will arrange for preparation of a draft FAD, which will be in writing, state the reasons underlying the decision, recommend corrective action if and as appropriate, and advise the complainant of the right to appeal the recommended FAD to the Peace Corps Director, or designee. To the extent feasible, this will be completed within 120 days of the filing of the complaint. However, ***the OCRD Director has discretion to extend the period.***"

22 C.F.R. § 306.9(i) (emphasis added). If the proposed FAD is appealed, "[t]he Peace Corps Director, or designee, will, to the extent feasible, decide the issue within 45 days of the date of receipt of the appeal." *Id.* § 306.9(l). That the regulation provides a non-binding suggested timeline that the OCRD Director has free discretion to extend is of no moment. *See Elec. Priv. Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1245 (D.C. Cir. 2018) ("A non-binding document cannot impose on an agency an enforceable duty to act."). Indeed, Plaintiffs concede

41

that Peace Corps' March 2021 revision to its regulations "remove[d] the 180-day limit" and that the regulation "now permits the Peace Corps OCRD Director to extend the Peace Corps' response time indefinitely without notice to the complainant or reasonable basis." Am. Compl. ¶ 53. Peace Corps' decision to revise its regulation to give the OCRD Director that discretion "made clear" that the agency "did not intend to bind itself" to any particular timeline. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1245 (D.C. Cir. 2018).

Ultimately, because the time period for Peace Corps' discrimination complaint process is discretionary, the Court lacks jurisdiction over Plaintiffs' unreasonable delay claim. *Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) ("[B]ecause the pace of the adjudication of Beshir's application is discretionary, the Court lacks jurisdiction over Beshir's claim that defendants have unreasonably delayed adjudication."); *Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173, 187 (D.D.C. 2008) ("Since Congress has left these matters to the agency's discretion, a court may not mandate greater timeliness and accuracy (even there was a rational way to define such requirements).").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Jane Doe E's claims for lack of jurisdiction pursuant to Rule 12(b)(1), and Plaintiffs' remaining claims pursuant to Rule 12(b)(6).

Dated: July 12, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ Clayton L. Bailey*
CLAYTON L. BAILEY (D.C. Bar # 1644867)
LISA ZEIDNER MARCUS (N.Y. Bar # 4461679)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Twelfth Floor
Washington, D.C. 20005
Tel: (202) 598-1226

Fax: (202) 616-8470
Email: clayton.l.bailey@usdoj.gov

*Counsel for Defendant*