UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE A, *et. al.,*

    *Plaintiffs*

v.

CAROL SPAHN,

    *Defendant*.

Civil Action No. 1: 23-cv-02859 (CJN)

**MEMORANDUM OPINION**

    John and Jane Doe plaintiffs are eight individuals whose applications for overseas volunteer positions with the United States Peace Corps were rejected on the grounds that each of them suffers from a mental disability. They raise a series of challenges here, both as to the internal guidelines the Peace Corps employs for determining medical fitness, as well as to their individual determinations. The government moves to dismiss some of their claims; for the reasons discussed below, the Court grants that motion in part.

                       **I.**     **Background**

**A.**    **Legal Background**

    Congress established the Peace Corps in 1961 with the passage of the Peace Corps Act. Pub. L. No. 87-293, 75 Stat. 612, 612–25 (Sept. 22, 1961) (codified as amended at 22 U.S.C. §§ 2501–2523). The Peace Corps' purpose is to "promote world peace and friendship" by exporting American workers and volunteers "qualified for service abroad and willing to serve, under conditions of hardship, if necessary, to help the peoples of such countries . . . in meeting their needs for trained manpower, particularly in meeting the basic needs of those living in the poorest areas of such

countries." 22 U.S.C. § 2501. As of December 1981, the Peace Corps is an independent federal agency. *See* 22 U.S.C. § 2501-1; International Security and Development Cooperation Act of 1981, Pub. L. No. 97-113, § 601, 95 Stat. 1519, 1540–42 (Dec. 29, 1981).

The Peace Corps Act authorizes the President to "enroll in the Peace Corps for service abroad qualified citizens and nationals of the United States," whom the Peace Corps Act calls "volunteers." 22 U.S.C. § 2504(a). The Act specifies that all "terms and conditions" of volunteer service "shall be exclusively those set forth in [the Act] and those consistent therewith which the President may prescribe." *Id*. § 2504(a). The President has delegated his authority and functions conferred by the Peace Corps Act to the Director of the Peace Corps. Exec. Order No. 12137 of May 16, 1979, § 1-103, 44 Fed. Reg. 29023 (May 18, 1979).

Peace Corps regulations expressly provide that "[t]he Peace Corps does not discriminate against any person on account of… disability." 22 C.F.R. § 305.1(d); *see also id*. §§ 306.1, 306.2(a), 306.3. But they also state the Peace Corps' interests in ensuring that a volunteer can "[p]erform the job to which [he] is assigned," and that the Peace Corps is "capable of providing [him] with such health care as the Peace Corps deems necessary…." 22 C.F.R. § 305.4(a)(2).

To that end, the regulations lay out the standards for volunteer eligibility and selection, including medical eligibility. *Id*. §§ 305.2–305.6. In particular, applicants "must have the physical and mental capacity required to meet the essential eligibility requirements for a Volunteer." *Id*. § 305.4(a)(1). Medical eligibility is an "individualized assessment." *Id*. § 305.4(b); *see also id*. § 305.4(c)(2). Accordingly, all Peace Corps volunteer applicants must pass a medical clearance screening. And Peace Corps medical screeners consult a series of "Guidelines" to help them determine, in light of the medical disclosures made by the applicant during the screening, whether the applicant is healthy enough to merit clearance. ECF 22-4 at 2.

Those guidelines state "THESE ARE GUIDELINES. EACH APPLICANT RECEIVES AN

INDIVIDUAL REVIEW AND CLEARANCE STATUS IS ULTIMATELY UP TO THE CLINICAL JUDGMENT OF THE REVIEWER." *Id*. at 1 (emphasis in original). With respect to mental health issues, the Guidelines set out what they call "disqualifying criteria." Those criteria include, for example:

- Taking "as-needed anti-anxiety medication" or "sleep medication" any time in the past year. ECF 22-5 at 2.

- A diagnosis of ADHD in addition to any history of, *inter alia*, an eating disorder, a seizure disorder, a substance use disorder, or a psychiatric hospitalization. ECF 18-1 at 11.

- A diagnosis of Bipolar Disorder. *Id.* at 20.

- Any prescription of more than two psychiatric medications of any kind. *Id.* at 12.

In the event an applicant believes the denial of a volunteer position was discriminatory, the regulations prescribe a process, facilitated by the Peace Corps' Office of Civil Rights and Diversity ("OCRD"), for appealing that decision. An aggrieved party must begin by "bring[ing] [his] allegations to the attention of [the OCRD] within 60 days of the alleged discriminatory action." 22 C.F.R. § 306.8. A counselor will then attempt to resolve the allegations through a "pre-complaint procedure" that will finish in 30 days unless the OCRD Director chooses to extend the period upon the aggrieved party's showing of good cause. *Id.* at § 306.8(a), (b), (g). If, after inquiry and counseling, an informal resolution is not reached, the counselor will notify the aggrieved party in writing of the right to file a formal complaint of discrimination with the OCRD Director. *Id*. at § 306.8(h). That formal complaint is due within 30 days of the notice; following its submission, an OCRD investigator "will… review… the circumstances under which the alleged discrimination occurred, and any other circumstances which may constitute, or appear to constitute, discrimination against the complainant." *Id.* at § 306.9(e). "To the extent feasible," this review must culminate in a draft final decision from the OCRD

Director within 120 days. *Id.* at § 306.9(k), § 306.9(l). The aggrieved party has 10 days to appeal that decision to the Director of the Peace Corps. If not timely appealed, the aggrieved person can file suit challenging the OCRD Director's decision. If it *is* timely appealed, the Peace Corps Director will issue her *own* opinion—which can then be challenged. *Id.* at § 306.9(l), (m).

Also relevant here is the Rehabilitation Act of 1973, which prohibits disability discrimination in federally funded programs. Section 501 (somewhat confusingly recodified as § 791 of Title 29 of the U.S. Code) prohibits disability discrimination by federal employers. 29 U.S.C. § 791. Section 504 (recodified as § 794 of Title 29) extends that prohibition to discrimination in "any program or activity receiving Federal financial assistance" and "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).

Section 505[1] of the Rehabilitation Act provides various remedies for violations of the statute. Section 505(a)(1) grants injured parties "[t]he remedies, procedures, and rights set forth in section 717 of the Civil Rights Act … with respect to any complaint under section 791 of this title," that is, for discrimination by federal employers. And Section 505(a)(2) provides plaintiffs "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act" for discrimination at the hands of "any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

**B.    Factual Background**

Plaintiffs are eight individuals, proceeding under pseudonym, who suffer from different mental

---

[1] The relevant portion of § 504 is § 794(a) of Title 29; § 505 is § 794a of Title 29. § 794(a) and § 794a are different provisions; the Court flags this nuance because it can prove confusing on first impression. [2] As noted above, seven plaintiffs had claimed that the Peace Corps unlawfully delayed a decision on their administrative appeals; the government, for its part, argued in its motion to dismiss that those plaintiffs had failed to exhaust their administrative remedies before filing suit. Because the Peace Corps has since finally decided each of those appeals, plaintiffs' undue delay claims are moot and the government's exhaustion argument is no longer applicable.

health disabilities. All were preliminarily invited to serve as Peace Corps volunteers but, after disclosing their mental health disabilities during their medical clearance screeners, all were deemed medically ineligible for service. ECF 1 at 4, 6; ECF 23 at 5.

Some of these denials stemmed from the Peace Corps' determination that it lacked the capacity to provide the plaintiff with necessary medical treatment overseas. For example, the Peace Corps determined that the Philippines did not have "adequate or appropriate mental health care and psychiatric resources to effectively support [John Doe A's] current condition." ECF 22-2 at 3. Other denials stemmed from the Peace Corps' determination that the condition would interfere with the plaintiff's ability to serve as an ineffective volunteer. The Peace Corp rejected John Doe C, for example, because he required an "active medication regime of Duloxetine 60mg twice a day, Buspirone 20mg three times a day, Doxepin 100mg three times a day, Buprenorphine three times a day, and Ritalin 40mg twice a day"—and being under the "sedat[ing] influence" of that amount of medication was incompatible with volunteer service in the "austere environment" of Fiji. *Id.* at 7. Others were rejected because, for example, the Peace Corps concluded that the medical dosage "exceeded the recommended maximum," or because the recommended dosage might actually "exacerbate" the plaintiff's symptoms. *Id.* at 12, 14.

Each of the eight plaintiffs appealed these denials administratively. Each utilized the informal process; in each case, the Pre-Service Review Board upheld the denial. ECF 22 at 25. Each plaintiff then filed an administrative complaint with the OCRD. On August 29, 2018, plaintiff Jane Doe E received a decision from the OCRD upholding her denial. ECF 18-1 at 43. By the time this suit was filed on September 26, 2023, however, none of the other seven plaintiffs had received a decision. Accordingly, in addition to their substantive challenges (addressed below), those seven plaintiffs initially claimed that the Peace Corps had unlawfully delayed a final decision on their claims. Since then, however, each plaintiff has received a final agency decision on those questions. *See* ECF 16.

Accordingly, what primarily remains in this case are plaintiffs' substantive challenges to the Peace Corps' Guidelines. Plaintiffs claim that the mental health screening Guidelines are themselves unlawful, either as inconsistent with the Rehabilitation Act or as arbitrary and capricious under § 706 of the Administrative Procedure Act. ECF 18-1 at 53, 55. They also claim that their individualized rejections are unlawful, again as inconsistent with the Rehabilitation Act or the APA.

The government moved to dismiss on various grounds. As still relevant here,[2] it contends that Jane Doe E's claims are moot because the volunteer program to which she applied has since ceased to exist (ECF 22 at 14); that the Rehabilitation Act does not provide a private right of action (*id.* at 18); and that the guidelines do not constitute final agency action under the APA (*id.* at 30).

## II.     Analysis

**A.     Jane Doe E's Claims are Not Moot**

The government argues that Jane Doe E's claims are moot because, while she was denied the opportunity to volunteer for a particular program, that program has since been discontinued. In particular, Jane Doe E originally applied to a program known as "GHSP," which offered "high-impact, short-term" volunteer opportunities for U.S. citizens with medical backgrounds to "assist in strengthening teaching and training capacity" in medical or nursing schools overseas and to "build capacity in the health systems of developing countries." ECF 22-1 at 2. The Peace Corps discontinued GHSP in 2018. ECF 23 at 13. But it also launched a similar program the next year called "AHP," which it describes as "offer[ing] volunteers high-impact, short-term opportunities abroad to improve health care education and strengthen health systems in resource-limited areas abroad." ECF 23 at 13.

---

[2] As noted above, seven plaintiffs had claimed that the Peace Corps unlawfully delayed a decision on their administrative appeals; the government, for its part, argued in its motion to dismiss that those plaintiffs had failed to exhaust their administrative remedies before filing suit. Because the Peace Corps has since finally decided each of those appeals, plaintiffs' undue delay claims are moot and the government's exhaustion argument is no longer applicable.

The Court recognizes that these programs are not completely identical, and it also recognizes that Jane Doe E has not taken the (potentially futile) step of applying for a position with AHP. But given these programs' substantial similarity and the fact that the case is still at just the pleading stage, the Court concludes that the government's motion to dismiss on this question should be denied.

**B.      The Rehabilitation Act Does Not Provide a Private Right of Action Here**

The government also moves to dismiss to dismiss Count One, plaintiffs' Rehabilitation Act claim, on the ground that the Act does not create a private right of action to sue a federal agency (such as the Peace Corps) under Section 504 for non-employment, non-funding actions like those challenged here. ECF 25 at 12-16. Plaintiffs, for their part, respond that Section 504(a) contains just the type of "rights creating language" that the Supreme Court has recognized as authorizing a private right of action. ECF 23 at 30.

The parties' disagreement on this question mirrors a split among certain Judges on this Court on the same question. On the one hand, Judges Moss and McFadden have held that the Rehabilitation Act does not create a private right of action for non-employment, non-funding actions. *See SAI v. Department of Homeland Security*, 149 F. Supp. 3d 99 (D.D.C. 2015),and *Mathis v. United States Parole Commission*, 749 F. Supp. 3d 8 (D.D.C. 2024). Chief Judge Boasberg, on the other hand, has held that the Act does create a private right of action. *See Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 53 (D.D.C. 2020)

The Court concludes that the better view is that the Rehabilitation Act does not create a private right of action here. To be sure, the language in § 504, read in a vacuum, may well create a presumption of a private right of action for Rehabilitation Act claims. *Mathis*, 749 F. Supp. 3d at 18. But the rest of the statute is inconsistent with that position. In particular, as described more fully in Judge McFadden's thoughtful opinion, the Act contains "three discrete prohibitions" of discrimination by three discrete groups: (1) federal agencies in their capacities as employers (§ 501); (2) recipients

of "federal financial assistance" funding (§ 504); and (3) executive agencies acting as conductors of federal programs (also § 504). *See Id.* at 17. But Section 505 provides explicit private relief—that is, the full scope of "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964"—only with respect to the first two categories: "any complaint under § [501] of this title" (that is, discrimination by federal employers); and "to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section [504] of this title" (that is, discrimination by recipients of federal funding). 29 U.S.C.A. § 794a(a)(2). Where, as here, Congress did not expressly extend private relief to the third category, the Court concludes that the existence of explicit private rights of action for the federal-employer and funding-recipient provisions implies the exclusion of a right of action for the program-conductor provision. *See id.*; *see also Mathis*, 749 F. Supp. 3d at 19 (internal quotation marks omitted).[3]

**C.    The Guidelines Are Not Final Agency Action.**

That leaves plaintiffs' APA claims, which as relevant here are asserted in Counts Two and Three of the Amended Complaint. *See supra* p. 6 n.2; ECF 18-1 at 55, 59. The government does not move to dismiss those claims in their entirety; in particular, the government concedes that plaintiffs' APA challenges to their individual denials may proceed. Instead, the government argues that plaintiffs cannot challenge the screening and clearance Guidelines under the APA because they do not constitute agency action or final agency action. Instead, the government contends, they are a nonbinding and

---

[3] Because the Court holds that the Rehabilitation Act does not provide a private cause of action in these circumstances, the Court declines, at this time, to decide whether the Peace Corps Act preempts any such right of action—even though it recognizes that the question of the preemptive effect of the Peace Corps Act may remain live as this case progresses.

In addition, relying on *Mathis*, plaintiffs argued at oral argument that they can pursue their Rehabilitation Act claims even absent a private right of action under the Act because federal courts have inherent equitable authority to enjoin the government from committing statutory violations. *See Mathis*, 749 F.Supp.3d at 22. This issue has not been fully briefed, however, and the Court therefore declines to take it up in this opinion.

internal government resource that is used to inform individualized assessments.  ECF 22 at 43.

The Court agrees.  As an initial matter, "[l]egislative rules generally require notice and comment, but interpretive rules and general statements of policy do not." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).  To be legislative, a rule must have the "force and effect of law," which is the case only when a plaintiff can "establish a nexus between the [rule] and some delegation of the requisite legislative authority by congress." *Id.* at 250.  And a legislative rule must impose "legally binding obligations on regulated parties." *Id.* at 251.  While the Guidelines were surely relevant (perhaps highly so) in how Peace Corps reviewers acted upon plaintiffs' applications, plaintiffs have failed plausibly to allege that the Guidelines bound the reviewers to reach particular outcomes.  In fact, the Guidelines themselves state that clearance is "UP TO THE CLINICAL JUDGMENT OF THE REVIEWER," ECF 22-5 at 2 and while plaintiffs point to other language in the Guidelines, they also concede that Peace Corps staff have ultimate discretion to grant or deny clearances based on an individualized review.  ECF 23 at 52.  Moreover, the Guidelines fit into two statutory exceptions to notice and comment rulemaking:  as matters "relating to agency management or personnel," and as "statements of policy." 5 U.S.C. §§ 553(a)(2), (d)(2); *see also See Stewart v. Smith,* 673 F.2d 485, 496–500 (D.C. Cir. 1982) (no notice and comment for age limit in hiring policy); *Hamlet v. United States,* 63 F.3d 1097, 1105 (Fed. Cir. 1995) (no notice and comment for personnel management handbook).  The Guidelines therefore do not constitute a legislative rule subject to the notice and comment process.

Nor do the Guidelines constitute final agency action—or even agency action in the first place.  For the Guidelines to constitute final agency action, "rights or obligations," or "legal consequences" must "flow" from them.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  To that end, the Court of Appeals has held that "[t]he distinction between 'general statements of policy' and 'rules' is critical," and has looked to both the "effects of an agency's action" and the "agency's expressed intentions" in

determining whether something counts as final agency action. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806–07 (D.C. Cir. 2006.

Here, no consequences flow from the Guidelines themselves. Instead, the determination is made by a reviewer, applying the Guidelines; as the Guidelines themselves provide, the decision is "UP TO… THE REVIEWER." ECF 22-5 at 2 And the Guidelines are just one of many things that reviewers may consult; under the regulations, reviewers are to consider "information from the applicant and their physicians, current medical research, screening guidelines developed by OMS, knowledge and experience of the nature of Peace Corps service, and information about the scope of medical care available overseas." *Id.* at 2, ECF 22-6 at 5. It is those individualized decisions, and not the Guidelines, that constitute final agency action.

### III.   Conclusion

For the foregoing reasons, the Government's Motion to Dismiss Plaintiffs' First Amended Complaint, ECF 22, is granted in part and denied in part. A separate order accompanies this opinion.

DATE: May 6, 2025

CARL J. NICHOLS
United States District Judge